# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3240

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LARRY S. GOODEN, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-cr-30015-DRH-1—**David R. Herndon**, *Chief Judge.*

ARGUED APRIL 21, 2009—DECIDED MAY 7, 2009

Before BAUER, EVANS and WILLIAMS, *Circuit Judges.*

PER CURIAM. Larry Gooden pleaded guilty to conspiring to kidnap and using a firearm during a crime of violence. In a proffer agreement, Gooden admitted to participating in a six-day crime spree that involved robbing several people at gunpoint, abducting a victim and holding him captive in the trunk of his car for several days, and attempting to rape another victim. A probation officer calculated the guidelines range to be 444 to 525 months' imprisonment, and the district court sentenced him to 600 months based on the brutality of

his offense and his recidivism. Gooden appeals, arguing that his sentence is unreasonably high. Because the sentence is reasonable, we affirm.

Gooden and his co-conspirator, Barry Williams, began their crime spree by robbing a laundromat in Cahokia, Illinois. Armed with a sawed-off shotgun, they entered the laundromat and forced a patron at gunpoint into the bathroom and robbed him. After hitting the victim and threatening to kill him, they abducted him and stole his car, forcing him to ride and sleep in the trunk for four days. They periodically withdrew money from his bank account using his ATM card, and, at one point, forced him again at gunpoint to go to a drive-through teller window at a bank and withdraw $2,000. The victim was held in the trunk while Gooden and Williams drove around Missouri and Illinois, and they allowed him out of the trunk only to eat and to use the bathroom. On one occasion, after he was allowed out of the trunk, Gooden told him, "I want to kill you so bad my dick is hard." The victim would sometimes use an emergency latch inside the trunk to look outside for an opportunity to escape, but feared that if they caught him trying, Gooden and Williams would kill him. The victim finally found a fortuitous moment when he recognized his surroundings and managed to flee on foot to his parents' home.

Gooden and Williams then drove the victim's car onwards to St. Louis, Missouri, where they held up two truck drivers outside a restaurant at gunpoint; in a scuffle that ensued, the drivers were both injured.

Later that day, Gooden and Williams approached a woman who was exiting a restaurant in Berkeley, Missouri, put a sawed-off shotgun to her back, and forced her into her car. Williams drove, while Gooden followed in the car they stole from the Cahokia victim. They drove to the back of a large parking lot where Williams told Gooden to "watch his back" while he attempted to rape the woman. The victim struggled with Williams, who threatened to hit her with the sawed-off shotgun, which in turn discharged into the dashboard of her car. Williams then tried to start the car but it would not start, and the two men dragged the victim out of her car towards the other car.

A police officer then showed up on the scene, and Gooden and Williams fled on foot. Gooden soon returned to the stolen car he had been driving. He sped off, and the police chased him at speeds over 100 miles per hour. The chase ended with Gooden crashing the car, appropriately, near a police station in Sauget, Illinois. The police arrested Gooden and found evidence from the crime spree: the sawed-off shotgun; a work shirt (worn by Gooden) bearing the Cahokia victim's name embroidered on the front; and the wallet of one of the truck-driver victims.

Gooden entered a proffer agreement and plea agreement and pleaded guilty to conspiracy to commit kidnapping, 18 U.S.C. § 1201(a)(1) and (c), and possession of a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(I). The plea agreement required that Gooden give complete information about crimes committed during the crime spree. A proba-

tion officer calculated Gooden's guidelines range for the kidnapping count to be 324 to 405 months' imprisonment and, adding the firearm count's required consecutive minimum of 120 months' imprisonment, a total guidelines range of 444 to 525 months. *See* U.S.S.G. § 5G1.2.

Gooden asked for a psychological examination to determine whether he was competent to stand trial. Bureau of Prisons psychologists diagnosed him with a "Mood Disorder Not Otherwise Specified," finding that, although he did not meet the full criteria for depressive or bipolar disorder, he exhibited some symptoms of a mood disorder including mild depression, irritability, "racing thoughts at times," and mild sleep disturbances; they concluded that he did not have a mental defect nor was he incompetent to stand trial.

About a week before the district judge was to sentence Gooden, the government sought a finding that Gooden had breached the plea agreement by failing to provide complete information about the crimes he had committed. It turned out that Gooden's DNA matched evidence found during an investigation of an unsolved rape of a 16-year-old girl that had occurred during Gooden's six-day crime spree, and the victim had identified Gooden and Williams in a photographic lineup. Gooden chose not to contest the government's motion and entered a guilty plea without a plea agreement.

At the sentencing hearing, Gooden argued that he had been manipulated by Williams, and that he needed mental health care and should receive a reduced sentence because of diminished capacity. Gooden also argued that he was no more culpable than Williams, who had received

a within-guidelines sentence of 40 years. Williams, however, as Gooden acknowledged, entered his plea agreement before the rape of the 16-year-old had been discovered; thus the government did not learn until after his sentencing that Williams had breached the plea agreement by not disclosing that crime.

The judge rejected Gooden's argument that he had diminished capacity, noting that the psychological evaluation concluded that he did not have a mental defect. The judge also noted that diminished capacity was not reflected by the nature of Gooden's threats to his victims, including his expression of a physical desire to kill his kidnapping victim. And even if he were to conclude that Gooden did suffer from diminished capacity, the judge added, he would not be eligible for a reduction because the guidelines do not provide for one when specific deterrence is an overriding concern. *See* U.S.S.G. § 5K2.13.

The government, citing the brutality of Gooden's crimes, the multiple times that the shotgun was brandished, and the number of victims of his violence, sought an above-guidelines sentence of 576 months. The judge, however, went further and sentenced Gooden to 600 months' imprisonment, reasoning that the crime spree, involving armed violence, robbery, abduction, and sexual assault, called for a longer sentence to protect society from Gooden. The judge pointed out that a 10-year minimum sentence would be imposed for one use of a firearm even if it were never fired, and Gooden had brandished the sawed-off shotgun four times, and it had been discharged once. The judge rejected Gooden's argument that he was simply led by others, finding instead that Gooden was a

"full partner in a six-day crime spree." The judge also noted Gooden's extensive criminal history, including crimes that were not reflected in Gooden's criminal history score.

The district judge followed up his exemplary sentencing discussion with a 22-page sentencing memorandum that detailed his reasons for imposing the 50-year sentence, and referred to all of the factors in § 3553(a).

On appeal, Gooden argues that his sentence is unreasonable. He maintains that the district judge failed "to point out how these crimes and the defendant's role were not adequately taken into consideration" by the guidelines, and that a variance with the guidelines was not justified with reference to 18 U.S.C. § 3553(a) and the grounds for increases listed in U.S.S.G. § 5K2.0. He also argues that his 50-year sentence creates an unwarranted sentencing disparity with Williams's 40-year sentence and thus strays afoul of § 3553(a)(6).

Sentences that are outside the guidelines range are reasonable if they conform to the sentencing factors in 18 U.S.C. § 3553(a), *United States v. Simmons*, 485 F.3d 951, 953 (7th Cir. 2007), and a sentencing judge should support an above-guidelines sentence with "compelling justifications," *United States v. Gordon*, 513 F.3d 659, 666 (7th Cir. 2008). Here, the judge gave extensive justifications for imposing a 50-year sentence on Gooden. The judge noted Gooden's extensive criminal history, *see* 18 U.S.C. § 3553(a)(1), specifically pointing out that Gooden had committed crimes shortly after being released from prison, and concluded that Gooden was a recalcitrant "brutal criminal" who was trying to manipu-

late the system "by relying on some sort of mental issue," the same way he manipulates his victims. The judge also pointed out the need to protect society from Gooden, *see* 18 U.S.C. § 3553(a)(2)(C), reasoning that Gooden was an "extraordinary danger to society" who had shown no remorse. The judge considered the need for general deterrence, *see* 18 U.S.C. § 3553(a)(2)(B), noting the importance of warning "persons like the defendant" that "they will be removed from society for a very long period of time if they pursue this kind of activity."

Gooden characterizes the district judge's justifications for increasing his sentence on the basis of his role in the offense, *see* 18 U.S.C. § 3553(a)(1)-(2), as "conclusory." He argues that it was Williams, not Gooden, who put the shotgun to the back of the woman whom he then attempted to rape, and that it is unclear who injured the truck drivers. We disagree. The judge noted that Gooden was a full partner in Williams's crimes, and that the guidelines range for the firearm charge was the statutory minimum, and did not take into consideration the multiple times the shotgun was used, the fact that it was discharged, or the overall violent nature of the six-day crime spree.

Gooden's argument that his sentence is unreasonable in comparison to Williams's 40-year sentence is similarly unpersuasive. *See* 18 U.S.C. § 3553(a)(6). We do not view the "discrepancy between sentences of co-defendants as a basis for challenging a sentence" and will disturb a sentence only if it creates an unwarranted sentence disparity between similar defendants nationwide. *See United States v. Omole*, 523 F.3d 691, 700 (7th Cir. 2008). Gooden

does not point to any similar sentences in other cases that would show that his sentence creates an "unjustified difference across judges (or districts)." *See United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). Moreover, as the government points out, Williams was sentenced (by the same judge) under the terms of a plea agreement where the government recommended the low-end of Williams's 480-months to life-imprisonment range. As the judge noted, Williams benefitted from the fact that his involvement in the rape of the sixteen-year-old girl was unknown at the time of his sentencing, and the government was unaware that Williams had breached the terms of the plea agreement.

Finally, Gooden argues that he was not notified of the district court's intention to give an above-guidelines sentence, in violation of Federal Rule of Criminal Procedure 32(h). We have cast doubt on the continued applicability of Rule 32(h) post-*Booker*. *See United States v. Walker*, 447 F.3d 999, 1007 (7th Cir. 2006). In any event, Rule 32(h) requires notice before a court can give an above-guidelines sentence based on information that is not in the presentence report, and Gooden had "full knowledge of all the facts on which the district court relied for its § 3553(a) analysis" because the judge based the sentence entirely on information in the presentence report. *Id.* at 1007.

Accordingly, we AFFIRM Gooden's sentence.