In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-1196, 08-1197 & 08-1198

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JON BARTLETT, ANDREW R. SPENGLER, and
DANIEL MASARIK,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 06-CR-273—**C.N. Clevert, Jr.**, *Judge*.

ARGUED MAY 15, 2009—DECIDED JUNE 8, 2009

Before EASTERBROOK, *Chief Judge*, and BAUER and
ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. The distance between civiliza-
tion and barbarity, and the time needed to pass from one
state to the other, is depressingly short. Police officers
in Milwaukee proved this the morning of October 24, 2004.

Andrew Spengler held a housewarming party that
started on October 23 and lasted into the next morning.
Spengler and many guests were police officers. Liquor

flowed freely. Katie Brown and Kirsten Antonissen were among the invitees. They arrived after 2:30 AM on October 24 with Frank Jude and Lovell Harris. The quartet was immediately made to feel unwelcome because the women are white, and the men are not. (Harris describes himself as black; Jude describes himself as bi-racial.) After five minutes, the four prepared to leave—but they were prevented when at least ten men stormed outside, surrounded Antonissen's truck, and demanded to know what the four new arrivals had done with Spengler's badge. Spengler says that he could not find it after the quartet arrived, and he accused them of theft. The men demanded that the four get out of the truck and surrender the badge. When they stayed inside, the men threatened them ("Nigger, we can kill you") and began to vandalize the truck. Harris tried to wake the neighbors; the men responded: "Nigger, shut up, it's our world."

Eventually all four were dragged from the truck. A search did not turn up the badge. Instead of concluding that Spengler's accusation was mistaken, the men became enraged and violent. One cut Harris's face in a way that he described as "slow and demented." Harris managed to free himself and run away. Multiple men began to kick and punch Jude. Antonissen managed to call 911; she told the operator "they're beating the shit out of him." When the men saw Antonissen use the phone, they wrested it from her hand and flung her against the truck so forcefully that its metal was dented. Brown made two calls to 911 before her phone, too, was seized.

The first call was logged at 2:48, and two officers (Joseph Schabel and Nicole Martinez) arrived at 3:00. The beating continued until their appearance. Men punched Jude's face and torso; when he fell to the ground, they kicked his head and thighs. The partygoers behaved as a mob. Not a single person in the house tried to stop the attack or even to call for aid. Jon Clausing, who had slashed Harris's face, explained his conduct as "just kind of going along with everybody." That is the way of the mob. Society has police forces to pose a counterweight to mobs, yet here the police became a mob.

Schabel and Martinez were on duty and had not been drinking, so they should have put a stop to the violence. Instead Schabel joined it, while Martinez watched. On being told that Jude had stolen Spengler's badge, Schabel called Jude a "motherfucker" and stomped on his face until others could hear bones breaking. After telling Martinez "I'm really sorry you have to see this," Daniel Masarik picked Jude off the ground and kicked him in the crotch so hard that his body left the ground. Jon Bartlett then took one of Schabel's pens and pressed it into each of Jude's ear canals, causing severe injury and excruciating pain. The men also broke two of Jude's fingers by bending them back until they snapped. Spengler put a gun to Jude's head and said: "I'm the fucking police. I can do whatever I want to do. I could kill you." Bartlett used a knife to cut off Jude's jacket and pants, leaving him naked on the street in a pool of his own blood.

The violence tapered off when additional on-duty police arrived. At 3:09 officers arrested Jude. Yes, they arrested

the victim, although Jude had never fought back. (He had suffered a concussion and was unable to defend himself.) Jude was taken to an emergency room; the admitting physician took photographs because "[t]here were too many [injuries] to document" in writing. The injuries to Jude's ears could not be diagnosed because the physicians could not control the bleeding. One physician testified that she had never seen ear injuries so severe. While Jude was receiving treatment, on-duty officers recovered Jude's car. Bartlett and other men had ripped up its seats with knives and poured antifreeze over them; apparently they poured antifreeze into the gas tank too, damaging the engine. The radio had been wrecked. The men broke a headlight and tore a mirror off Antonissen's truck. Spengler's badge was not found in either the car or the truck; perhaps he had put down the badge in the house and was too soused to remember where.

Bartlett, Spengler, and Masarik were prosecuted in state court and acquitted after Schabel and others committed perjury on their behalf, while many people who had been at the party claimed to suffer memory loss. That made it impossible to show who had done what, and the judicial system (unlike a mob) demands personal responsibility. The Civil Rights Division of the Justice Department then investigated, and federal prosecutors persuaded several witnesses to cooperate. Four men (Joseph Schabel, Ryan Lemke, Jon Clausing, and Joseph Stromei) pleaded guilty to obstruction of justice (by perjury, including false testimony before the federal grand jury), to violating Harris's and Jude's civil rights, or

both. Bartlett, Spengler, and Masarik were convicted by a jury of conspiring to violate Harris's and Jude's right to be free from unreasonable searches and seizures (18 U.S.C. §241), and of the substantive offense (18 U.S.C. §242). (Excessive force in making an arrest violates the fourth amendment to the Constitution, applied to state police officers by the fourteenth amendment. See *Graham v. Connor*, 490 U.S. 386 (1989).) Bartlett was sentenced to 208 months' imprisonment, Spengler and Masarik to 188 months apiece. All seven men have been fired by the Milwaukee Police. Two more officers were fired but later reinstated; an additional four were disciplined.

Bartlett, Spengler, and Masarik present twelve appellate issues. Only four require discussion. The rest have been considered, and we reject them without comment.

**1.** The maximum punishment for a violation of either §241 or §242 is 120 months' imprisonment. The longer sentences that Bartlett, Spengler, and Masarik received depend on convictions of both offenses. All three contend that the evidence of conspiracy is insufficient. Conspiracy is agreement to violate some other law, see *United States v. Shabani*, 513 U.S. 10 (1994), and defendants maintain that events developed without an agreement. When Spengler called for aid to recover his badge, people rushed from the party to Antonissen's truck without prior negotiation or agreement.

This perspective assumes that the agreement must predate the first substantive offense. Yet it need not. An agreement forged in the course of committing a crime, among people who plan to work together in an ongoing

criminal venture, is no less a conspiracy than one that precedes the first overt act. The battery of Jude lasted for 20 minutes. A reasonable jury could infer that defendants and others formed a plan to do whatever was necessary to recover Spengler's badge and punish the thief—a plan carried out through cooperative criminal activity. Working together to commit a series of criminal acts, in which each cooperative act implies a plan to cooperate in the future, is a functional understanding of conspiracy. See *United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1993) (en banc); *United States v. Wantuch*, 525 F.3d 505, 519 (7th Cir. 2008). None of the evidence suggests that defendants worked at cross-purposes with each other, or with the rest of the mob. The evidence is enough to permit an inference of agreement and thus a conviction for conspiracy.

**2.** Masarik contends that he did not participate in the beating. He concedes that he was at the party but says that he stayed indoors or on the mob's periphery. He did not report the crime or assist the prosecution, so he might have been convicted of misprison of felony, see 18 U.S.C. §4, but if he was a bystander he did not violate §241 or §242.

Six witnesses testified that Masarik held Jude while others punched and kicked him. Some of these witnesses testified that Masarik kicked Jude in the face at least twice, and that Masarik kicked Jude in the crotch (after apologizing to Martinez). Masarik contends that he must have been confused with someone else, and he proposed to present expert testimony about high error rates in

eyewitness identifications. The district court excluded the proposed testimony for two principal reasons. First, the judge stated that jurors could determine the reliability of identifications using the evidence from direct and cross examinations. Second, the judge invoked Fed. R. Evid. 403, which allows the exclusion of evidence that is needlessly cumulative or will consume trial time out of proportion to its value.

The first of these reasons is weak. Doubtless lawyers will ask questions designed to assist the jurors in evaluating whether a witness is telling the truth. But the problem with eyewitness testimony is that witnesses who *think* they are identifying the wrongdoer—who are credible because they believe every word they utter on the stand—may be mistaken. Study after study has shown very high error rates in the identification of strangers. See, e.g., Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* (3d ed. 1997) (collecting studies); Elizabeth F. Loftus, *Eyewitness Testimony* (1979; rev. ed. 1996); Daniel L. Schacter, *The Seven Sins of Memory: How the Mind Forgets and Remembers* 112–37 (2001). "An important body of psychological research undermines the lay intuition that confident memories of salient experiences . . . are accurate and do not fade with time unless a person's memory has some pathological impairment. . . . The basic problem about testimony from memory is that most of our recollections are not verifiable. The only warrant for them is our certitude, and certitude is not a reliable test of certainty." *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 296–97 (7th Cir. 1990) (citations to the scholarly literature omitted).

It will not do to reply that jurors know from their daily lives that memory is fallible. The question that social science can address is *how* fallible, and thus how deeply any given identification should be discounted. That jurors have beliefs about this does not make expert evidence irrelevant; to the contrary, it may make such evidence vital, for if jurors' beliefs are mistaken then they may reach incorrect conclusions. Expert evidence can help jurors evaluate whether their beliefs about the reliability of eyewitness testimony are *correct*. Many people believe that identifications expressed with certainty are more likely to be correct; evidence that there is no relation between certitude and accuracy may have a powerful effect.

Still, using expert testimony to explore this question may sidetrack a trial. A judge must balance the benefits of illuminating evidence against the costs of collateral inquiries. That's why Rule 403 grants discretion to the trial judge—and why we have held, many times, that a trial court does not abuse its discretion by excluding expert evidence about the reliability of eyewitness testi- mony. See, e.g., *United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005) (collecting cases); *United States v. Hall*, 165 F.3d 1095 (7th Cir. 1999) (same).

The district judge did not abuse his discretion in this case, because the conviction does not rest on identifica- tions by Jude and the other victims. Only two of the people who identified Masarik were strangers to him. The other four knew him well. The social-science studies do not suggest that people who have known one another

for weeks or years are apt to err when identifying them in court. What's more, the scholarly work concerns identification by *single* eyewitnesses, not the probability of error when multiple witnesses identify the same person. If the six in-court identifications of Masarik were independent, and each had a probable error rate of .333 (that is, there is a one-in-three chance that any witness was mistaken), then the probability that Masarik is innocent is .333 to the sixth power, or well under 1%. We have remarked before that the scholarly findings about eyewitnesses have only limited application when multiple witnesses identify the same person. See *United States v. Williams*, 522 F.3d 809 (7th Cir. 2008); *Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003). Masarik did not proffer any evidence about the error rates in six-fold identifications. Nor did he propose to ask an expert whether the six identifications should be regarded as independent, or what the risk of error in these identifications taken jointly is apt to be. Someone who proposes expert testimony must show how the findings apply to the litigation at hand; Masarik did not do this.

A concurring opinion in *Hall* added that, although jurors should be made aware of the scholarly findings in appropriate cases, it is often better to have the judge summarize the state of knowledge than to have a parade of experts. 165 F.3d at 1120. Masarik did not ask the judge to recap the scholarly findings for jurors' benefit. For him, it was an expert on the stand or it was nothing; the judge did not abuse his discretion in blocking that testimony in order to keep this trial on track.

**3.** All three defendants contend that their sentences are unreasonably high when evaluated under the criteria in 18 U.S.C. §3553(a). They stress §3553(a)(6), which requires a sentencing judge to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". Lemke, Clausing, Schabel, and Stromei all received sentences considerably less than 188 months; Bartlett, Spengler, and Masarik contend that this difference makes their sentences unreasonably high.

We have encountered this argument before and rejected it.

> There would be considerably less cooperation—and thus more crime—if those who assist prosecutors could not receive lower sentences compared to those who fight to the last. Neither [*United States v.*] *Booker*[, 543 U.S. 220 (2005)] nor §3553(a)(6) removes the incentive for cooperation—and because this incentive takes the form of a lower sentence for a cooperator than for an otherwise-identical defendant who does not cooperate, the reduction cannot be illegitimate. After all, §3553(a)(6) disallows *"unwarranted* sentence disparities" (emphasis added), not all sentence differences.

> [T]he kind of "disparity" with which §3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case. If the national norm for first offenders who gain $275,000 or so by fraud is a sentence

in the range of 33 to 41 months, then system-wide sentencing disparity will *increase* if Boscarino's sentence is reduced so that it comes closer to Aulenta's. Instead of one low sentence, there will be two low sentences. But why should one culprit receive a lower sentence than some otherwise-similar offender, just because the first is "lucky" enough to have a confederate turn state's evidence? Yet that is Boscarino's position, which has neither law nor logic to commend it.

Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly. That was the main goal of the Sentencing Reform Act. The more out-of-range sentences that judges impose after *Booker*, the more disparity there will be. A sentence within a properly ascertained range therefore cannot be treated as unreasonable by reference to §3553(a)(6).

*United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). Defendants acknowledge that the circuit's law is against them, but they contend that we must reevaluate the subject in light of *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), which emphasized that the Guidelines are not binding and that district judges have considerable discretion to implement their own conceptions of just sentences, notwithstanding the Sentencing Commission's views. See also *Spears v. United States*, 129 S. Ct. 840 (2009); *Nelson v. United States*, 129 S. Ct. 890 (2009).

To address defendants' contention, we must separate two questions: first, does §3553(a)(6) *require* a judge to reduce anyone's sentence below the Guideline range because other persons who committed the same crime but pleaded guilty and cooperated received lower terms?; second, does §3553 as a whole *permit* a judge to go below the Guideline range for this reason?

The first of these questions received a negative answer in *Boscarino* and similar cases, which have observed that §3553(a)(6) addresses only "unwarranted" disparities. A difference justified by the fact that some wrongdoers have accepted responsibility and assisted the prosecution, while others have not, is not "unwarranted." The best way to curtail "unwarranted" disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly. Far from disapproving this understanding, the Supreme Court adopted it in *Gall*:

> Section 3553(a)(6) requires judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The Court of Appeals stated that "the record does not show that the district court considered whether a sentence of probation would result in unwarranted disparities." 446 F.3d at 890. As with the seriousness of the offense conduct, avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges. Since the District Judge correctly calculated and carefully reviewed the Guide-

lines range, he *necessarily* gave significant weight and consideration to the need to avoid unwarranted disparities.

128 S. Ct. 586, 599 (emphasis added). A sentence within a Guideline range "necessarily" complies with §3553(a)(6).

But there is more to §3553 than §3553(a)(6). A judge must respect all of the statutory criteria in order to mete out a sentence "sufficient, but not greater than necessary, to comply with the purposes [of sentencing] set forth in paragraph (2) of this subsection." 18 U.S.C. §3553(a). The Court held in *Kimbrough*, and reiterated in *Spears*, that a judge need not accept the Sentencing Commission's penological framework. The court may adopt its own. It follows that §3553 permits a judge to reduce one defendant's sentence because of another's lenient sentence—not *because of* §3553(a)(6), but *despite* it. Avoiding "unwarranted" disparities (as the Sentencing Commission or a court of appeals defines them) is not the summum bonum in sentencing. Other objectives may have greater weight, and the court is free to have its own policy about which differences are "unwarranted."

It follows that, if the district judge thought himself forbidden to take account of Lemke's, Clausing's, Schabel's, or Stromei's (relatively) low sentences when deciding what punishment to impose on Bartlett, Spengler, or Masarik, he was mistaken. The judge did not make this error, however. He concluded that the disparity is justified by material differences in the offenders' conduct and acceptance of responsibility, not that a disparity is unjustified but irremediable. The district judge followed

§3553(a), and understood the extent of his discretion, when sentencing Bartlett, Spengler, and Masarik.

**4.** Masarik was sentenced at the top of his range (151 to 188 months); that sentence is reasonable under §3553 and *Rita*. See also *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) (an in-range sentence is presumed reasonable on appeal). Spengler's sentence of 188 months exceeds the top of his range (121 to 151 months) but is reasonable under *Gall*: the district judge properly deemed him the instigator. Some of his conduct, such as pointing a gun at Jude's head and proclaiming authority to kill anyone he wanted, was not taken into account in the Guidelines calculation.

Bartlett's sentence of 208 months likewise exceeds the top of his range. He committed the most brutal acts. Thrusting a pen into a person's ear canals is torture by any definition. While facing the state charges, Bartlett threatened to blow up his former police station, a crime for which he has been convicted in state court and sentenced to 54 months. He also defrauded a gun dealer into selling him a submachine gun, violating gun-control laws as well as the terms of his federal bail; this conduct drew another 18 months in a separate prosecution. A district judge might deem a lengthy consecutive sentence essential for incapacitation as well as deterrence and desert. But the court may not have appreciated that Bartlett's sentence exceeds his Guideline range.

Many cases in this circuit say that sentences exceeding the Guideline range must be explained not only in absolute terms, under the criteria of §3553(a), but also

with an analysis of why a Guideline sentence would be insufficient. See, e.g., *United States v. Gordon*, 513 F.3d 659, 666 (7th Cir. 2008); *United States v. Wachowiak*, 496 F.3d 744, 749–50 (7th Cir. 2007). These decisions did not survive *Nelson*, which holds that district judges need not—indeed *must* not—begin with a presumption in favor of a Guideline sentence. If there is no need to start from the perspective that an in-range sentence usually is best, there is also no need to explain why some different sentence is better. The judge's task is to choose a reasonable sentence. The court must take the Sentencing Commission's views into account, but a sentence cannot be called "unreasonable" just because the judge explains why he chose that sentence, rather than explaining his decision from the Guidelines' perspective. The old regime of "departures" is defunct. See *Irizarry v. United States*, 128 S. Ct. 2198 (2008).

Although the judge need not use the Guidelines as the fulcrum of analysis, the court still needs to understand the relation between the Guidelines and the ultimate sentence. Both *Rita* and *Gall* say that the court must construct a Guideline range accurately. A sentence is procedurally unreasonable if the judge thinks it within the range, but it isn't—either because the range was not determined accurately in the district court, or because the judge misunderstood what that range was.

Bartlett's range is 151 to 188 months. Much of the sentencing transcript reads as an explanation about why the sentence is at the high end of the range. At the end of the proceeding, the judge stated bluntly that the sen-

tence would be the top of the range. But the actual sen-
tence of 208 months is 20 months higher. That's a problem.

The prosecutor says that, by the close of the proceeding,
the judge had recognized that 208 months exceeds Bart-
lett's range. The transcript is not as clear to us as it
appears to be to the prosecutor. Given the risk of confu-
sion, the better part of wisdom is to ask the district judge
to take another look, to ensure that the sentence rests on
a deliberate choice rather than a mistake. A 208-month
sentence is reasonable substantively, but no one, not
even a Bartlett, should lose 20 months of freedom
because a district judge read across the wrong line in a
table. (The range 168 to 210 months is the next highest
in the Guidelines' sentencing table.)

Nonetheless, the prosecutor maintains, Bartlett for-
feited any opportunity for appellate relief because he did
not "object" to the 208-month sentence on the ground that
it exceeds the Guideline range. We put "object" in scare
quotes because remonstration with the judge is not an
objection as usually understood. Both the Rules of Evi-
dence and the Rules of Criminal Procedure require a
litigant to make known the position it advocates and to
present evidence and argument for that position. These
steps are essential to facilitate intelligent decision in the
district court. Counsel present positions, and judges
then decide. But the rules do not require a litigant to
complain about a judicial choice after it has been made.
Such a complaint is properly called, not an objection, but
an exception. The rule about exceptions is explicit: "Excep-
tions to rulings or orders of the court are unnecessary."

Fed. R. Crim. P. 51(a). Rule 51(b) adds that a litigant preserves a contention for review "by informing the court [before the decision is made] of the action the party wishes the court to take . . . and the grounds for" that action. Bartlett and his lawyer argued for a lower sentence, and they gave reasons. They have preserved their appellate options.

Having said this, we must acknowledge that some of our opinions use the word "objection" in the same way the prosecutor did, and they hold (or at least suggest) that lawyers must ask a judge to reconsider the sentence (or other decision) as the price of appellate review. See, e.g., *United States v. Harvey*, 232 F.3d 585, 587 (7th Cir. 2000); *United States v. Marvin*, 135 F.3d 1129, 1135 (7th Cir. 1998). These decisions do not discuss Rule 51(a), and for the most part they did not need to; they are compatible with Rule 51(b), which (in language that we did not reproduce above) requires a protest immediately after the ruling if the litigant did not have an opportunity to argue the point earlier. When the judge surprises counsel, it is far better to air and resolve the matter in the district court than to bypass available opportunities for correction and save the issue for appeal. But when an issue is argued before the judicial ruling, counsel need not take exception once the court's decision has been announced. That's what Rule 51(a) says. Bartlett's sentence was the subject of extensive argument and evidence; his lawyer did not need to argue with the judge once the sentence had been pronounced.

All three convictions, and the sentences of Spengler and Masarik, are affirmed. Bartlett's sentence is vacated, and

his case is remanded for proceedings consistent with this opinion.