In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-2436, 10-2468 & 10-2469

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DERRICK COURTLAND, JOSEPH ADDISON, and
JOHN BACON,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Southern District of Illinois.
No. 09-cr-30101-MJR—**Michael J. Reagan**, *Judge*.

ARGUED JANUARY 6, 2011—DECIDED APRIL 27, 2011

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
ROVNER, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Defendants Derrick Courtland,
John Bacon and Joseph Addison pleaded guilty to a dog
fighting conspiracy and the district court sentenced them
to varying terms of incarceration above the guidelines
recommendation. Each defendant appeals his sentence,
requesting that this court reverse the district court and
remand for resentencing. We affirm.

### I. Facts and Procedural History

This case arises from a loosely-organized dog fighting conspiracy in the St. Louis metro area called the "Backstreet Truez," and connected with a kennel of that name. A combined state and federal investigation led to numerous arrests and indictments and the seizure of over 120 pitbulls, most of which were so aggressive that the Humane Society destroyed them. At least seven defendants pleaded guilty to conspiracy, 18 U.S.C. § 371, based on 7 U.S.C. § 2156, "Animal fighting venture prohibition," which makes it unlawful *inter alia* "for any person to knowingly sponsor or exhibit an animal in an animal fighting venture." Seven defendants were sentenced in a consolidated sentencing hearing, and of that number, three presently appeal. The arguments on appeal relate exclusively to sentencing. This case illustrates that innovative procedures can sometimes be very helpful and are not to be automatically condemned as without precedent.

In advance of the sentencing hearing, the district court judge *sua sponte* submitted his own report on dog fighting, which he entered into the record as a "sentencing memorandum." The district court explained in the memorandum that the document's purpose was to fulfill "[the court's] sentencing obligation, . . . to consider the 'the nature and circumstances of the offense'" under 18 U.S.C. § 3553(a)(1). The district court judge indicated that, unlike most crimes with which he dealt, he had little general knowledge of dog fighting and he felt he ought to conduct his own research into the subject. He

also stated that the memorandum was "entered well in advance of the sentencing hearing in the instant case in order to provide the parties with research the Court has gleaned outside the record in this case."

The court's 22-page memorandum surveyed the history and the present state of dog fighting, in the United States and abroad. The memorandum was marked by a tone of concern and alarm, and it described a host of the worst abuses in the dog fighting world as disclosed in various sources. For one example, the memorandum stated that "[t]o increase aggression, these dogs may be starved, have lit cigarettes burned into their coats, or may be beaten with a variety of crude instruments including broken bottles, pipes, or even machetes." The memorandum directly linked dog fighting with other crimes, stating "dog fighting is closely associated with some of the most serious crimes plaguing our society and may involve people with extensive criminal backgrounds." The memorandum occasionally seemed to portray dog fighting as a threat running to the very heart of civil society, stating for example that "[b]ecause of the significant damage the sport causes children, dog fighting offenses must be treated with the utmost seriousness in order to avoid a future generation that is devoid of compassion and anesthetized to violence." And at one point, the memorandum seemed to be transformed into an exercise in post-apocalyptic vision, describing depressed urban areas where "packs of feral dogs patrol the streets in search of food."

The district court made it clear that it was not attributing the worst aspects of dog fighting described in

the memorandum to the defendants before it. In the opening paragraphs of the memorandum, the judge wrote "[t]his review of the history and methodology of dog fighting is generic; that is, it is not meant to be construed as applicable to the cases currently on the Court's docket which have their own histories and fact patterns."

The defendants did not object to the court's memorandum, and several of them referred to the document in their own sentencing memoranda. For instance, Courtland entered a sentencing memorandum arguing that he was merely a "hobbyist" as opposed to a "professional handler"—terms defined in the court's Memorandum.

On June 1, 2010, the district court held a combined sentencing hearing. The court calculated that the "total offense level" was eight, a figure that incorporated a two-point reduction from ten for acceptance of responsibility. This resulted in a guidelines recommendation of zero to six months for the defendants with a criminal history category of one. All three present appellants had a criminal history category of one, and therefore all three qualified for a guidelines recommendation of zero to six months.

The court adduced the following facts. Courtland acted as "either co-owner or operator or a principal" of Backstreet Truez; he bred dogs and he acted as a referee during fights and participated in at least three roll

fights.[1] Authorities recovered seven pitbulls from Courtland's property, all of which were euthanized. Bacon was significantly involved in the dog fighting conspiracy, and trained and possibly bred pitbulls. Moreover, based on Bacon's allocution, the court concluded that Bacon did not believe he had done anything wrong. The authorities removed over thirty pit bulls from a property that he shared with a non-appealing conspirator, of which thirteen were euthanized. Addison was a co-owner of Backstreet Truez, and he bred fighting dogs and refereed fights. Once, when one of Addison's dogs lost a fight, he electrocuted her in front of the crowd. Authorities removed fifty-nine pit bulls from his property, of which twenty-four were euthanized.

Immediately before pronouncing sentences, the court spoke about its pre-sentencing memorandum, stating as follows:

> I have written a detailed order with respect to the history and background of dog fighting in an effort not only to educate myself but to give background regarding dog fighting in general. It was not then, nor is it now, intended to cover the details of your respective cases. This is, however, the first dog fighting case that I have encountered in my ten years on the bench. I handle a lot of drug and gun cases

---

[1] A "roll fight" is a sort of sparring match. Dog fighters conduct them to determine the potential of the dog and to expose it to different fighting styles.

and I don't need to write a dissertation about those, I deal with them all the time, but so that you and your attorneys would have the benefit of my research, since it was not part of the record, I did make it part of the record and place[d] you on notice in advance.

The court first sentenced all of the defendants to a 3-year term of supervised release and imposed on each a $100 mandatory special assessment. The court then addressed each defendant individually and imposed a term of incarceration. Courtland received an eighteen-month sentence, and Bacon received a sixteen-month sentence. The court found that Addison deserved the "extraordinary cruelty" departure described in U.S.S.G. § 2E3.1, application note 2,[2] as a result of his electrocution of his defeated dog. He received a twenty-four month sentence. On June 14, 2010, the defendants timely appealed, raising the following issues[3] for our review:

(1) Whether the sentencing judge's memorandum conflicts with Article III of the Constitution or violates the constitutional principle of separation of powers;

(2) Whether the court should remand the sentencing because the court's memorandum contained little

---

[2] The application note provides, "[i]f the offense involved extraordinary cruelty to an animal that resulted in, for example, maiming or death to an animal, an upward departure may be warranted."

[3] The issues have been reworded for ease of discussion.

more than extraneous evidence and inflammatory comments;

(3) Whether the sentences imposed in this case are procedurally unsound because the district court departed upward without providing an adequate explanation for the upward departures;

(4) Whether the defendants' sentences are substantively unreasonable.

## II. Applicable Law

As we explain in greater depth below, it is not clear exactly what legal principles govern the court's sentencing memorandum. Nevertheless, we comment briefly on the legal principles the defendants invoke.

The defendants have raised arguments related to Article III of the Constitution, which provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may . . . establish." The Supreme Court has recognized a "broad prohibition upon the courts' exercise of 'executive or administrative duties of a nonjudicial nature,' . . . to maintain the separation between the Judiciary and the other branches of the Federal Government by ensuring that judges do not encroach upon executive or legislative authority or undertake tasks that are more properly accomplished by those branches." *Morrison v. Olson*, 487 U.S. 654, 680-81 (1988) (internal citation omitted). Accordingly, we have emphasized that judges may not take on a role properly occupied by prosecutors.

*See In re United States*, 345 F.3d 450, 454 (7th Cir. 2003). However, we view this present effort of a judge to inform himself of the subject before him as raising no issues of separation of powers. So this objection goes nowhere.

The defendants also direct us to our recent opinion in *United States v. Figueroa*, 622 F.3d 739 (7th Cir. 2010). In that case, we reversed the district court because during the sentencing hearing, the district court engaged in an "extraneous and inflammatory" lecture, *id.* at 740-41, which included "a number of comments about [Figueroa's native] Mexico and . . . Mexico's contribution to drug and immigration issues in the United States," *id.* at 743, and "reveal[ed] an odd focus on nation-states and national characteristics," *id.* We concluded that even though Figueroa had been sentenced at the bottom of the guidelines, we had "no way of knowing how, if at all, these extraneous considerations influenced Figueroa's sentence." *Id.* at 744. Accordingly, we vacated the sentence and remanded for resentencing by a different judge.

With respect to sentencing matters unrelated to the district court's "sentencing memorandum," the present case calls on us to apply the familiar framework for reviewing district court sentencing decisions. We first consider whether the district court committed any procedural error, and then consider whether the sentence was substantively unreasonable. *See United States v. Hall*, 608 F.3d 340, 346 (7th Cir. 2010).

As to the procedural inquiry, we ask whether the sentencing court erred by "failing to calculate (or

improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors . . . or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (U.S. 2007). But recent case law indicates that the sentencing court need not frame its explanation of a sentence in terms of a departure from the guidelines range, but may instead focus on the appropriateness of the sentence under § 3553. *United States v. Bartlett*, 567 F.3d 901, 909 (7th Cir. 2009) (citing *Nelson v. United States*, 129 S. Ct. 890 (2009)); *see also United States v. Vaughn*, 614 F.3d 412, 415 (7th Cir. 2010). Questions of procedural error are reviewed de novo. *See Hall*, 608 F.3d at 346.

We review the substantive reasonableness of a sentence for an abuse of discretion, even when it is outside the guidelines. *See Gall*, 552 U.S. at 51. There is no presumption of unreasonableness merely because a sentence is outside of the suggested guidelines range but rather we ordinarily give the sentencing court deference if "the factors in 18 U.S.C. § 3553(a), as a whole, justify the extent of the variance from the guidelines." *United States v. Wise*, 556 F.3d 629, 632-33 (7th Cir. 2009). Under this analysis, "[t]he farther the judge's sentence departs from the guidelines . . . the more compelling the justification based on factors in section 3553(a) that the judge must offer in order to enable the court of appeals to assess the reasonableness of the sentence imposed." *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005). Again, however, after *Bartlett* a court's explanation may be sufficient even if not framed in terms of a departure from the guidelines.

### III.  Discussion

### A.  The Sentencing Memorandum

At the outset, we disagree with the Government that arguments relating to the court's memorandum have been waived. As described above, the court entered the sentencing document on its docket as a memorandum and opinion, and referred to it in court as an "order." We accept the court's characterizations, which connote finality, at face value. Under Federal Rule of Criminal Procedure 51(a), "[e]xceptions to rulings or orders of the court are unnecessary." *See also Bartlett*, 567 F.3d at 910 ("[T]he rules do not require a litigant to complain about a judicial choice after it has been made."). Instead, preserving a claim is ordinarily accomplished by raising the issue in advance of the ruling. *See* Fed. R. Crim. P. 51(b). Moreover, "[i]f a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." *Id.* Here, the record does not reveal to what extent the defendants were on notice of the court's impending filing, and in any case under these unusual circumstances we could not ask them to anticipate the contents of the document.

Turning to the merits, we observe that court's memorandum is apparently *sui generis*; it is not entirely clear what rule or precedent might govern its propriety. *See* Elizabeth G. Thornburg, *The Curious Appellate Judge: Ethical Limits on Independent Research*, 28 REV. LITIG. 131, 169 (2008) ("Principles relevant to judicial research come from the worlds of ethics, evidence, procedure, and the

Constitution."). The court obviously did not apply the strictures of judicial notice under Federal Rule of Evidence 201,[4] but the material in the memorandum was not treated as judicially noticed fact.[5] Fortunately, we need not find a home in legal taxonomy for the court's memorandum.

As indicated, we reject the defendants' assertion that the district court's filing exceeded the powers of the judiciary established in Article III of the Constitution. We emphatically decline this invitation to set limits on a judge's powers to educate himself on matters relevant to sentencing. We find nothing in the cases cited by the defendants or in our own research that directs such restrictions,[6] and we are unwilling to recognize sig-

---

[4] That rule requires in relevant part that a judicially noticed fact be "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

[5] The judicial notice rule "governs only judicial notice of adjudicative facts." Fed. R. Evid. 201(a). "Adjudicative facts are simply the facts of the particular case." *United States v. Wolny*, 133 F.3d 758, 764 (10th Cir. 1998) (quoting advisory committee notes to Rule 201).

[6] Indeed, *Mistretta v. United States*, 488 U.S. 361 (1989), which the defendants cite for language highlighting the importance of the separation of powers, concluded that the separation of powers principle was not offended by the judiciary's assump-

(continued...)

nificant limitations on the judicial branch in establishing a perspective on charged crimes—particularly little-known crimes.

Moreover, the defendants' citation of *Figueroa* is completely unpersuasive. There is no indication that any agitated or expansive language here about broad social problems associated with dog fighting had any direct application to these sentences. Here, the judge repeatedly stated that the material in its memorandum was not being attributed to the defendants. We certainly accept the court's representation. *See, e.g., Lucini Italia Co. v. Grappolini*, 288 F.3d 1035, 1038 (7th Cir. 2002) (taking the district court at its word about an argument it stated it did not consider). In fact, the sentencing hearing in the present case was routine except for the unusual number of defendants. If this were a drug possession case, a court's comments about related pervasive social problems would be taken as routine. Here, the judge carefully and serially distinguished the evidence related to each of seven co-conspirators. The arguably inflammatory language of the memorandum was absent from

---

[6] (...continued)

tion of sentencing rulemaking duties, in view of the central "role that the Judiciary always has played, and continues to play, in sentencing." *Id.* at 390-91. Also of possible relevance to the present case, the *Mistretta* Court stated, "[o]ur constitutional principles of separated powers are not violated . . . by mere anomaly or innovation." *Id.* at 385.

the imposition of the respective sentences.[7] The judge hewed to the § 3553 factors.

Judges generally are under no obligation to relate all they have learned about a species of crime from whatever source to those accused of the crime in question. We note with approval that the district court was concerned with giving the parties the opportunity to comment on the general reference material it consulted. To do so here was in keeping with the spirit of, but not required by, the Code of Conduct for United States Judges in the sense that the Code of Conduct requires judges to give parties an opportunity to respond to *ex parte* communications.[8] If the judge in this case had read the same background material and not informed the parties (which is common practice, and not objectionable), it might not have reflected such a sensitive respect for the adversary process. Nevertheless, we do not rule

---

[7] The main manifestation of the court's memorandum at the sentencing hearing was that the court and parties used the conventions of "hobbyist" versus "professional" to describe the depth of the defendants' immersion in the dog fighting scene. These terms appeared in the court's memorandum, where they were defined. The court and the parties used these terms fluidly, and without referencing the definitions in the court's memorandum. We are not troubled by the use of these terms, which appear to have served as an innocuous shorthand to aid in the task of distinguishing among the seven co-conspirators.

[8] Code of Conduct for United States Judges, Canon 3A(4); *see also* ABA Model Code of Judicial Conduct, Rule 2.9(A)(1)(b).

out the possibility that where there has been a "litany of inflammatory remarks," *Figueroa*, 622 F.3d at 744, we cannot be as certain as we are here that they did not influence the sentence. In other words, relevant to our affirmance is our confidence that the district court did not attribute to the defendants the evils related in the "sentencing memorandum." On the whole, we believe the district court's recourse to, and handling of a "sentencing memorandum" was unusually sensitive to the rights of the parties and provided them and the court with an appropriate perspective on the sentencing task.

### B. Sentencing Procedure and Substantive Reasonableness

We turn now to the defendants' argument that the court erred with respect to the sentences themselves, and we first address the procedural questions. As a threshold matter, no one argues that the district court improperly calculated the guidelines range.[9] And we do not credit

---

[9] We note that for a moment during the sentencing hearing, the court seemed to be saying that the appropriate offense level was ten, the base offense level prescribed in U.S.S.G. § 2E3.1(a)(2), instead of eight, the base level less the two-point reduction for acceptance of responsibility. Other than pointing this out in a footnote, App.'s Br. 25 n.6, the defendants do not make any argument that the court applied an erroneous guideline range, and we believe the court did not. The court

(continued...)

the argument that the defendants have raised—that the district court inadequately justified its imposition of an above-guidelines sentence.

It is clear that the district court was concerned with the lack of incremental punishment for conspiracy in the sentencing guidelines. The court stated:

> The Guidelines in this case . . . are deficient in that they do not account for multiple dogs, multiple fights, or the injuries that the dogs suffered. Under the Guidelines, if you had one dog, one fight, you are looking at the same Guideline range as if you had 100 and 100 fights and they all had to be euthanized. . . . That simply does not make sense because there is no incremental punishment. There are no specific offense characteristics in the guidelines that allow for enhancements regarding the length of the conspiracy, the number or circumstances surrounding the actual fights, or as I said, the number of dogs involved. Likewise, there is no enhancement for being a facilitator or sponsor of the fight[.]

The district court's sentencing decisions were clearly informed by its concern about the inadequacy of the guidelines and the factors it believed were important but ignored. The court tallied the total number of dogs attributed to each defendant, as well as the number of those that had to be euthanized. The court also kept

---

[9] (...continued)

had previously identified the "total offense level" for the defendants as eight.

track of the number of dog fights in which the defendants participated, and the approximate duration of the defendants' involvement in dog fighting. The court discussed, where applicable, the leadership role of each defendant in the dog fighting enterprise. Finally, the court considered sentences imposed in the Eastern District of Missouri for other participants in the same conspiracy, with an eye toward avoiding unwarranted disparities. *See* 18 U.S.C. § 3553(a)(6).

While we express no opinion on the district court's apparent belief that the guidelines are *per se* deficient with respect to large dog fighting conspiracies, we agree that the court's sentencing considerations were proper, and together constituted permissible rationale for imposing an above-guidelines sentence. The number of dogs, the number of fights, the defendant's leadership role in the criminal enterprise and the duration of the misconduct can surely be considered part of the "nature and circumstances of the offense" of conspiracy under 18 U.S.C. § 3553(a)(1). And of course, the court's assessment of the § 3553 factors is the proper basis for any above-guidelines sentence. *See Dean*, 414 F.3d at 730-31 ("[T]he guidelines, being advisory, can be trumped by section 3553(a), which as we have stressed is mandatory.").[10]

---

[10] We disagree with the defendants' position that the judge did not provide adequate individualized reasons for departing from the guidelines. First, the district court is not necessarily at fault for declining to explain a sentence from the perspective of the guidelines, as long as it explains the sentence properly

(continued...)

We must address one defendant's case individually. No one contests that the court appropriately applied the "extraordinary cruelty" departure described in U.S.S.G. § 2E3.1, application note 2, to Addison in connection with his electrocuting a defeated dog. But Addison argues that he received a longer sentence than a non-appealing co-conspirator who participated in the same electrocution. This is unpersuasive. The other co-conspirator was a comparatively peripheral member of the conspiracy. In particular, he apparently did not

---

[10] (...continued)

under the § 3553 factors. *Bartlett*, 567 F.3d at 909 ("The court must take the Sentencing Commission's views into account, but a sentence cannot be called 'unreasonable' just because the judge explains why he chose that sentence, rather than explaining his decision from the Guidelines' perspective."). The defendants do nothing to reconcile their position with *Bartlett*. Second, the grounds for imposing an above-guidelines sentence may be equally applicable to the multiple defendants because of their joint involvement in a common crime. *See, e.g., United States v. Coe*, 220 F.3d 573, 579 (7th Cir. 2000). Here, the court clearly indicated that the circumstances of the crime justify an above-guidelines sentence. It would elevate form over substance to require the court to reiterate that logic before imposing each sentence, because the court's individualized § 3553 considerations for each defendant fit obviously within the court's earlier-described rationale for imposing above-guidelines sentences. *Cf. United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994) (court's joint sentencing memorandum did not offend a defendant's right to an individualized sentence).

own or breed fighting dogs. There is nothing *per se* improper about a sentencing disparity among co-conspirators, or even between the two of seven to whom a specific departure provision applies. *See generally United States v. Gooden*, 564 F.3d 887, 891 (7th Cir. 2009) ("We do not view the 'discrepancy between sentences of co-defendants as a basis for challenging a sentence' and will disturb a sentence only if it creates an unwarranted sentence disparity between similar defendants nationwide.") (citing *United States v. Omole*, 523 F.3d 691, 700 (7th Cir. 2008)); *United States v. Simpson*, 337 F.3d 905, 909 (7th Cir. 2003) ("[A] disparity among co-defendants' sentences is not a valid basis to challenge a guideline sentence otherwise correctly calculated.") (citing *United States v. Simmons*, 218 F.3d 692, 696 (7th Cir. 2000)).[11]

Having reviewed each defendant's sentence and the court's rationale for imposing an above-guidelines sentence, we conclude that the court properly justified its sentences.

The defendants' argument of substantive unreasonableness, which we review for an abuse of discretion, *see United States v. Miller*, 601 F.3d 734, 739 (7th Cir. 2010), is equally unavailing. It is true that the brevity of the sentences recommended in the guidelines enables the defendants to complain that their actual sentences are an impressive multiple of guidelines recommendations. This is not

---

[11] The similar arguments relating to Courtland and Bacon fail for the same reasons.

irrelevant, but it is also relevant that the amounts by which the sentences exceeded the guidelines were not extreme when viewed in absolute terms. Defendant Addison received the greatest above-guidelines increment in absolute terms, an overage of 18 months, and that was partly based on a finding that he qualified for an "extraordinary cruelty" departure under U.S.S.G. § 2E3.1, application note 2, for electrocuting a defeated dog. In view of the court's justifications as discussed above, we do not consider the district court to have abused its discretion by imposing substantively unreasonable sentences. In fact, overall we believe the sentencing judge did a highly commendable job in dealing with a crime not well known to him or to large sectors of the public.

For the foregoing reasons, we AFFIRM the judgments of the district court.