In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3297

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARGARET A. DAVIS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 11-30029-001 — **Sue E. Myerscough**, *Judge.*

ARGUED JUNE 4, 2014 — DECIDED AUGUST 20, 2014

Before WOOD, *Chief Judge,* and CUDAHY and ROVNER,
*Circuit Judges.*

ROVNER, *Circuit Judge.* By all accounts, Margaret Davis
relished her role as the "Mother Teresa" of the west side of
Chicago. As a long time nurse and assistant professor of
nursing at Chicago State University, she ran several different
public health programs aimed at improving the health care
of the African-American community. In addition to her roles
at African American AIDS Network, Health Works of Cook

County, Healthy Start, Southeast Chicago, and the
Healthcare Consortium of Illinois, she was also a program
director for the Chicago Chapter of the National Black
Nurses Association (CCBNA). In her position as program
director for CCBNA, Davis solicited and oversaw public and
private grants, contracts, and funds awarded to CCBNA.
Between December 2005 and March 2009, Davis solicited
and obtained contracts and grants totaling approximately
$1,062,000 from various Illinois state agencies.

Unfortunately for the intended beneficiaries of those
funds, Davis and her co-conspirator diverted a large portion
of the money for their own and other unintended uses. This
appeal is limited to one specific aspect of sentencing so we
need not elaborate on the details of the scheme other than to
say that the court estimated that, over the course of three
and a half years, Davis diverted approximately $377,000. She
did so by, among other things, writing checks to herself,
friends, and family members; concealing conflicts of interest;
hiring unqualified family members and other acquaintances
for positions in projects; forging co-signatures; and falsifying
information.

Davis pleaded guilty to one count of mail fraud and one
count of money laundering and waived her right to appeal
the reasonableness of the sentence, but reserved the right to
appeal any procedural error committed by the district court
or the amount of restitution, the latter of which she does not
appeal.

Under the terms of the plea agreement, the parties
concurred that based on the factors contained in 18 U.S.C.
§3553, Davis could be sentenced to, and the government
would recommend, no higher than a below-guidelines

sentence of 41 months' imprisonment—a significant break from the advisory guidelines range calculation of 57–71 months. The agreement preserved Davis' ability to challenge the guideline calculation and argue for whatever sentence she deemed appropriate. Davis waived the right to appeal the reasonableness of the sentence but reserved the right to challenge on appeal any procedural error at sentencing. She now claims that the district court erred procedurally by failing to adequately take into account her mental health when considering mitigating factors.

The mental health history that Davis claims was ignored was summarized in a presentence investigation report submitted to the court prior to sentencing. The report revealed that in 2007, doctors diagnosed Davis with bipolar disorder following an incident of steroid-induced psychosis that resulted from treatment for multiple sclerosis. Davis informed the probation officer who prepared the presentence report that while that particular episode brought forth the diagnosis, she had been experiencing symptoms associated with bipolar disorder since the 1970s. In February 2009, approximately three years after the charged scheme to defraud began, and a few months before it ended, Davis was hospitalized for having thoughts of and planning suicide. And then in October 2009, she was hospitalized again after an episode of mania, during which time she was abnormally agitated and complained of decreased cognitive function. She underwent a neuropsychological evaluation on March 24, 2010, which revealed psychological distress including significant symptoms of depression, somatic complaints, and bizarre sensory experiences. Just a little more than six months later, from October 10 through October 27, 2010, she was again

hospitalized at Rush University Medical Center following a manic episode. She returned to the hospital from February 10-25, 2011, due to worsening depression and problems with caring for herself. Davis reported to the probation officer that, at the time of the interview, her mental health was stabilized through medication, counseling, anger management, and sleep management.

After revealing these facts, the presentence report specifically noted that Davis' mental and emotional conditions might be relevant in determining whether a departure was warranted pursuant to United States Sentencing Guidelines (U.S.S.G.) § 5H1.3, and that under U.S.S.G. § 5K2.13 an adjustment might be warranted if Davis committed the offense while suffering from a significantly reduced mental capacity which substantially contributed to the commission of the offense. Finally, the presentence report noted that the court could consider a sentence outside of the advisory Guidelines based on Davis' mental and physical conditions pursuant to 18 U.S.C. § 3553(a)(1), which requires a sentencing court to consider a defendant's history and characteristics.

Prior to sentencing, Davis filed a 105-page sentencing memorandum with 56 exhibits—400 pages in all. Davis' argument that her mental health was a mitigating factor was the seventh of eight arguments in the memorandum.

To support her claim, she provided her mental health records and the 2012 and 2013 statements of five treating mental health professionals from several different health care facilities. One treating psychiatrist wrote to the court that "it is highly likely that [Davis] had at least some of these clinical manifestations [of mania and major depression as

part of bipolar I disorder] during the period she committed the crime(s)." R. 115. She also presented reports written by two retained forensic health care professionals. The first, Dr. Bernard Rubin, M.D., from the University of Chicago, reviewed Davis' records, but did not see her in person nor treat her. He found that Davis had psychological and physical difficulties which began to limit her capacities for insight and judgment, including impulse control, as early as mid-2006 to early 2007. The second retained expert, Sheryl Dolezal, Psy.D., described Davis' hypomanic behavior and physical and mental health conditions that lead to mood swings, aggression, emotional outbursts, paranoia, impulsivity and compromised judgment and decision-making, which Dr. Dolezal opined began prior to 2007. She wrote that, "Although Ms. Davis' choices/crimes … cannot be blamed entirely on her mental health or [multiple sclerosis], it is likely that they had some impact on her judgment and emotional state at the time." (R. 103, Exh. 52, p.8). She also noted, "How much of these behaviors were driving her poor judgment and decision making is difficult to determine, but are likely a factor." *Id.* The sentencing memorandum also pointed out that certain members of the CCBNA had noticed symptoms of mental health problems dating back to 2006 and worsening from 2007 to 2010 (R. 103, p.67).

The sentencing memorandum urged the court to address her mental condition and the effect it had on her ability to "exercise the power of reason and control her behavior." (R.103, p. 78–79). At the sentencing hearing, the government countered that despite the fact that Davis suffered from mental health ailments, there was no evidence that her mental condition had a substantial connection to the offense

or that it warranted deviation from the Guidelines. (R. 139, p. 229).

The district court judge began the sentencing hearing by noting that she had reviewed the presentence report, the plea agreements, Davis' sentencing memorandum, and all of the supporting exhibits and the many letters and spreadsheets detailing the investigation. At the end of the hearing she imposed a below-guidelines sentence of forty-one months.

Davis appeals arguing that the district court committed procedural error by failing to acknowledge and respond to Davis' argument about the mitigating role that her mental illness should have had on the sentence.

To avoid procedural error, sentencing judges must correctly calculate the guidelines range, evaluate the factors in 18 U.S.C. § 3553(a), and rely on properly supported facts. *U.S. v. Baker*, 755 F.3d 515, 522 (7th Cir. 2014) *(*quoting *United States v. Chapman*, 694 F.3d 908, 913 (7th Cir. 2012)). A sentencing judge must address a defendant's principal arguments in mitigation when those arguments have recognized legal merit. *U.S. v. Donelli*, 747 F.3d 936, 937, 939 (7th Cir. 2014), (citing *U.S. v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)). Sentencing judges have great discretion, but must offer enough of an explanation on the record that a reviewing court can satisfy itself that the district court actually exercised its discretion. *Donelli*, 747 F.3d at 939. We review de novo whether a judge adequately explained her chosen sentence. *United States v. Poulin*, 745 F.3d 796, 800 (7th Cir. 2014).

Although a sentencing court must offer a sufficient explanation for principal mitigating arguments that are not so weak as to not merit discussion (*Cunningham*, 429 F.3d at 679), the sentencing judge need only set forth enough facts to satisfy the appellate court that she has considered the argument and has a reasoned basis for exercising her legal decision-making authority. *U.S. v. Spiller*, 732 F.3d 767, 769 (7th Cir. 2013). "As long as the sentencing court considers the arguments in mitigation, even if implicitly and imprecisely, the sentence imposed will be found reasonable." *Id.*

The court's discussion of a mitigating factor need not be lengthy. "[T]he amount of explanation required from the district court varies with the circumstances." *U.S. v. Starko,* 735 F.3d 989, 993 (7th Cir. 2013). A brief explanation can certainly suffice. *See, e.g., Id.; U.S. v. Stinefast*, 724 F.3d 925, 931 (7th Cir. 2013) (finding the district court's discussion brief but sufficient to demonstrate consideration and rejection); *U.S. v. Diekemper*, 604 F.3d 345, 355 (7th Cir. 2010) (court acknowledged argument, which was sufficient to show consideration at least "implicitly and imprecisely"); and *U.S. v. Poetz*, 582 F.3d 835, 837–40 (7th Cir. 2009) ("totality of the record" showed that the judge considered the defendant's mitigation arguments and implicitly rejected them). In *Poetz*, we noted that the "requirement that the district court specifically address the defendant's principal, potentially meritorious sentencing arguments applies with less force" where "the judge received voluminous evidence and listened carefully to [the defendant's] arguments … and in the end imposed a short prison sentence significantly below the applicable guidelines range." 582 F.3d 837. In this case, the district court judge did exactly that.

In *Poetz*, the district court only implicitly rejected the defendant's arguments in mitigation, but in this case, there can be no dispute that the district court did so explicitly. The record reveals that at the outset of the hearing, the district court judge noted that she had reviewed the presentence report, the plea agreement, Davis' sentencing memorandum, and all of her supporting exhibits. Davis requested that some of the documents be submitted under seal, and the court granted her motion, so the district court judge would have reviewed the records for that determination as well. *See* Text Order of 10/03/13 ("After reviewing the Sentencing Memorandum and Exhibits 47-56, the Court GRANTS Defendant's … request to file the Sentencing Memorandum and Exhibits 47-56 Under Seal."); *see also* (R. 102, 113, 114).

The district court's discussion of Davis' mental health at the sentencing hearing was indeed brief. In fact, her entire discussion of the sentencing factors took only nine pages of transcript space. Given Davis' considerable mental health history, a more thorough discussion would have been helpful. Brevity, however, is not a sign of inadequacy. *See, e.g.*, *Stinefast*, 724 F.3d at 931–32. And in this case, the district court addressed Davis' mental health issues (and her physical health issues which contributed to her mental health problems) approximately six times in those nine pages of transcript. In that way, the discussion of her mental health permeated the discourse.

The district court judge first emphasized that she had considered the factors set forth in 18 U.S.C. § 3553(a), particularly Davis' history and characteristics. (R. 139, Tr. 10/8/13 at p.270). She then went on to say, "Your case is especially hard for me because of your personal history,

your medical conditions, even the difficulty the case agents had with calculating the loss amounts." *Id.* We also know that the district judge considered Davis' mental health when considering motivation, stating, "we have issues of motivation here. I don't understand them. The psychiatrists don't understand them." *Id.* at p.271.

After noting that she had considered all of the issues presented, the district court judge concluded, "You're responsible for your conduct. I do believe, truthfully, that [Assistant U.S. Attorney] Mr. Bass considered all the sentencing factors in coming to his recommendation for your sentence. And, certainly, those factors include your mental health and your physical condition with your MS, which I'm very glad to say is controlled at this time." *Id.* at p.272. Further noting Davis' mental health condition, the district court judge encouraged Davis to continue with treatment through psychotherapy and medication, both in prison and after her release. *Id.* at 272, 275, 277. She also ordered that as a condition of probation Davis participate in psychiatric services or a program of mental health counseling and treatment, and that she take all prescribed medications as directed by the treatment providers. *Id.* at 275. These multiple discussions demonstrate that Davis' mental and physical health were not only considered, but forefront in the judge's mind during sentencing.

We conclude, therefore, that the district court adequately considered, discussed, and then rejected Davis's argument that her sentence should be lowered due to her mental health condition. The judgment of the district court is AFFIRMED.