In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 18-2538, 18-3045, 18-3088, 19-1335, 19-1591, 19-1612, & 19-3405

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GERARDO SANCHEZ, EDGAR ROQUE, PHILLIP DIAZ, RICHARD ROQUE, OMAR RAMIREZ, STEVEN G. MENDOZA, & JUAN J. CERVANTES,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-CR-00485 — **Virginia M. Kendall**, *Judge.*

_____

ARGUED SEPTEMBER 30, 2020 — DECIDED MARCH 1, 2021

_____

Before SYKES, *Chief Judge,* and WOOD and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* The Roque drug trafficking organization moved in excess of 1,500 kilograms of cocaine and 100 kilograms of heroin from Mexico to Chicago for distribution and sale. The experienced district court judge who presided

over these consolidated cases had never seen "the level of drugs that were pumped into Chicago" by this criminal enterprise. On appeal, the Roque organization defendants largely responsible for these crimes—Gerardo Sanchez, Edgar Roque, Phillip Diaz, Richard Roque, Omar Ramirez, Steven Mendoza, and Juan Cervantes—do not dispute their convictions, but rather contest their sentences.

Although each defendant appeals individually, they raise many of the same arguments. Most contend the district court misinterpreted the need to avoid unwarranted sentencing disparities under § 3553(a)(6) and failed to adequately consider their arguments on this issue. Two of those defendants also challenge the district court's application of the Sentencing Guidelines, and two other defendants contest the imposition of certain supervised release conditions.

We conclude that the district court committed no error. The district court properly avoided unwarranted sentencing disparities, correctly applied the Sentencing Guidelines, and appropriately imposed supervised release conditions, with one minor exception that we order to be amended as necessary. In all other respects, we affirm the defendants' sentences.

## I

The Roque organization may have ended in Chicago, but it began in Los Angeles. In 2010, E. Roque joined with Sergio Ochoa and Jose Ochoa to obtain and distribute large amounts of drugs between the two cities. The trio bought the drugs in Los Angeles, transported them for sale within Chicago, and sent the proceeds back to Mexico. Although working in unison with the Ochoas, E. Roque kept his own crew, which included his brother R. Roque and Manuel Aragon Contreras.

E. Roque's distribution relationship with the Ochoa brothers eventually ended. In 2012, the Ochoas split from E. Roque, and in 2013, Contreras defected to the Ochoas. Together, they formed the Ochoa/Contreras drug trafficking organization. This new group, although sharing similar origins and engaging in similar conduct, existed separate and apart from the Roque organization from which it sprang. With the Ochoas gone, E. Roque alone ran what remained of the original organization and continued with his distribution efforts between Los Angeles and Chicago.

Like most criminal enterprises, the Roque organization had a hierarchy. E. Roque sat at the top. One step below came P. Diaz, E. Roque's brother-in-law who worked as a supervisor of sorts. Further down, R. Roque assisted in all elements of the drug trafficking. The mid-to-lower level members—those responsible for delivering narcotics and working the stash houses—included Sanchez, Mendoza, Ramirez, and J. Cervantes. Ivan Diaz (P. Diaz's brother), Angela Cervantes (J. Cervantes's sister), and Anthony Koon also operated within the middle tier. This hierarchical structure facilitated the Roque organization's drug trafficking, money laundering, and firearm possession.

*Drug Trafficking.* The Roque organization principally used Amtrak Express, a package shipping service, to transport drugs between Los Angeles and Chicago. To help, E. Roque recruited someone inside Amtrak's Los Angeles facility to ensure that the packages avoided inspection or confiscation. These smuggled packages ranged in size from three to forty kilograms of cocaine and one to two kilograms of heroin. When a shipment arrived in Chicago at Union Station, a member of the Roque organization would collect the package,

store it at a stash house, and then deliver it as instructed by E. Roque. Between 2012 and 2015, the Roque organization moved at least 159 packages of cocaine or heroin by Amtrak Express from Los Angeles to Chicago.

*Money Laundering*. The Roque organization also laundered the illicit proceeds from its drug trafficking. Lower-level members, at the direction of E. Roque, deposited funds into the bank accounts of E. Roque himself, R. Roque, P. Diaz, and Sanchez—all in their own names. To avoid bank reporting requirements, these lower-level members deposited the drug proceeds in increments of less than $10,000. The higher-ranking members then used these deposits to benefit themselves and to distribute funds throughout the Roque organization.

*Firearm Possession*. Firearms went hand-in-hand with this drug trafficking. When arresting Ramirez and Mendoza, law enforcement found a loaded AK-47 and Glock pistol at Ramirez's residence, and an assault rifle and associated ammunition (along with shooting targets emblazoned with "F*** the Police") at Mendoza's residence. Roque organization members also bragged about their firearms via Instagram direct messages to each other. For example, Mendoza sent a photo that depicted a hand holding an automatic rifle with a silencer attached. The photo's caption, translated into English, warned of a "rain of bullet[s] for the snitches."

## II

These appeals concern the sentences of the seven Roque defendants. To provide necessary context for their arguments that they received disparate sentences in violation of 18 U.S.C. § 3553(a)(6), we describe the sentences given to the other members of the Roque organization and members of the

Ochoa/Contreras organization.[1] The U.S. District Court for
the Northern District of Illinois adjudicated all of these cases.
Judge Virginia Kendall sentenced the Roque organization de-
fendants, and Judge Robert Gettleman sentenced the
Ochoa/Contreras organization defendants.[2]

## A

First, we describe the sentences of the seven Roque de-
fendants imposed by Judge Kendall. Each pleaded guilty to
either one or two counts of the fourth superseding indictment.
All seven—Sanchez, E. Roque, P. Diaz, R. Roque, Ramirez,
Mendoza, and J. Cervantes—pleaded guilty to Count One,
which charged a conspiracy to possess with intent to distrib-
ute, and to distribute, at least one kilogram of heroin and five
kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and
846. Four—Sanchez, E. Roque, P. Diaz, and R. Roque—also
pleaded guilty to Count Seven, which charged a conspiracy to
engage in money laundering in violation of 18 U.S.C.
§ 1956(h).

### 1. Sanchez

Sanchez, a courier and money launderer, received a total
sentence of 210 months' imprisonment, composed of 162
months on Count One and 48 months on Count Seven served
consecutively. During sentencing, Judge Kendall found him

---

[1] Title 18 U.S.C. § 3553(a), the familiar mandate of factors to be con-
sidered when imposing a sentence, provides in part: "The court, in deter-
mining the particular sentence to be imposed, shall consider— … (6) the
need to avoid unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar conduct."

[2] For clarity, we note which district court judge presided over the
cases involving each organization.

responsible for 231 kilograms of cocaine and 20 kilograms of heroin. Sanchez's 210-month sentence fell at the bottom of his guidelines range of 210 to 262 months.

Judge Kendall imposed supervised release conditions, two of which are relevant here: no contact with any codefendants and drug treatment. First, Judge Kendall orally imposed a condition banning Sanchez from "communicating and being engaged with his co-defendants in this activity." But the no-contact condition in his written judgment of conviction included two codefendants who pleaded guilty before the fourth superseding indictment—Koon and Jorge Luis Ochoa-Canela. Second, on drug treatment, Judge Kendall instructed the probation officer to conduct an "evaluation … to determine whether [Sanchez] needs any treatment when he's on release, whatever condition would be for that." Sanchez's written judgment included the related condition that he "shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year."

### 2. E. Roque

E. Roque, the leader of the Roque organization, received a total sentence of 420 months' imprisonment, composed of 300 months on Count One and 120 months on Count Seven served consecutively. During sentencing, Judge Kendall found him responsible for 1,500 kilograms of cocaine and 100 kilograms of heroin. E. Roque's 420-month sentence fell below his guidelines range of life imprisonment.

Concerning unwarranted sentencing disparities under § 3553(a)(6), both E. Roque and the government noted the various sentences that Judge Gettleman gave the Ochoa/Contreras defendants. E. Roque's counsel remarked that the Roque

and Ochoa/Contreras cases were "directly related" and that the Ochoa/Contreras defendants "should be in here to give the Court … the full picture." When E. Roque's counsel referred to the sentences of S. Ochoa (180 months by Judge Kendall) and Navarro-Galvan (58 months in a different district court), Judge Kendall interjected: "Neither of those are my sentences, right?"[3] E. Roque's counsel confirmed that fact and later concluded that "I'm requesting that [E. Roque] be sentenced to the 180 months, the same as Sergio Ochoa, as it's our opinion that he was in the same or parallel type case as Mr. Roque." By contrast, the government had previously rejected any comparison to S. Ochoa's sentence, calling it an "outlier."

In arriving at E. Roque's sentence under § 3553(a), Judge Kendall did not directly mention unwarranted disparities, but she did describe the scope, structure, and severity of the Roque organization conspiracy.

### 3. P. Diaz

P. Diaz, a lower-level worker, received a total sentence of 250 months' imprisonment, composed of 250 months on Count One and 120 months on Count Seven served concurrently. During sentencing, Judge Kendall found him responsible for between 150 and 450 kilograms of cocaine, as well as supervising the group and running a stash house. P. Diaz's 250-month sentence fell below his guidelines range of 292 to 365 months.

---

[3] Judge Dana M. Sabraw of the U.S. District Court for the Southern District of California sentenced Navarro-Galvan to time served, after he had been imprisoned for 58 months.

P. Diaz argued he should receive a similar sentence to Koon (108 months by Judge Kendall) to avoid unwarranted sentencing disparities under § 3553(a)(6). The government rejected that comparison, drew one to Sanchez, and argued that P. Diaz's greater involvement merited a longer sentence. The government also rejected any comparison to the sentence given to S. Ochoa (180 months by Judge Gettleman), asserting "it's an apples to oranges comparison." Because "[t]he drugs that are being moved and the way that [the Ochoa/Contreras organization is] moving drugs is totally separate than the way that [the Roque] organization was operating," according to the government, "you really can't compare on[e] to the other." Judge Kendall then asked, "[a]nd I just gave Mr. Roque 300 and 120; is that correct? 420 all together?" to which the government responded, "[c]orrect." P. Diaz's counsel also contrasted P. Diaz's situation with that of E. Roque and R. Roque, among others: "Phil Diaz is not Edgar Roque. He's not Richard Roque. He's not part of the original four that created this conspiracy at its inception that started way back in 2010. He's just a kid."

In fashioning P. Diaz's sentence under § 3553(a), Judge Kendall declared that "part of my sentence is significantly based upon the roles of the different conspirators here." When rejecting the government's request for a higher sentence, Judge Kendall additionally noted that "looking at the original guideline range of 292 to what Mr. Roque received, a 300, that's just not enough divergence between the activity range as far as how long he was involved as well as his involvement, and Mr. Roque's involvement was clearly more significant."

### 4. R. Roque

R. Roque, a "trusted" member of the Roque organization, received a total sentence of 210 months' imprisonment, based on 210 months on Count One and 48 months on Count Seven served concurrently. During sentencing, Judge Kendall found him responsible for at least 500 kilograms of cocaine and 100 kilograms of heroin. R. Roque's 210-month sentence fell at the bottom of his guidelines range of 210 to 262 months.

R. Roque argued in his sentencing memorandum for a sentence proportionate to those of Contreras (140 months by Judge Gettleman), Sanchez (210 months by Judge Kendall), and I. Diaz (108 months by Judge Kendall). In discussing the minor role reduction at sentencing, R. Roque's counsel also drew distinctions between R. Roque's conduct and the conduct of E. Roque, I. Diaz, Sanchez, Ochoa-Canela, and Contreras. Judge Kendall nevertheless rejected the minor role reduction and later found that R. Roque "understood the scope and the structure. And we certainly have the defendant here understanding, with his brother, the scope and the structure of how this is going to operate." The government also situated R. Roque within the larger Roque organization and argued for a 216-month sentence, one between Sanchez's 210-month sentence and P. Diaz's 250-month sentence.

When crafting R. Roque's sentence under § 3553(a), Judge Kendall noted R. Roque's "integral role in [the Roque organization] with [his] brother." But Judge Kendall did not directly address the sentences given to E. Roque, Sanchez, Ochoa-Canela, and Contreras.

Judge Kendall discussed three relevant supervised release conditions for R. Roque, concerning drug treatment, probation visits, and community service. First, Judge Kendall

ordered R. Roque to "participate at the direction of the probation officer in a substance abuse treatment program." She remarked: "So since I'm recommending drug treatment, it has to be any use of alcohol until you graduate from that program." Second, Judge Kendall stated that R. Roque should permit probation to visit designated locations at "any reasonable time." And third, Judge Kendall, appearing to direct comments toward the probation officer, rejected the presentence investigation report's recommendation for community service: "What I recommend, instead, is if, after 60 days of supervision, he is unemployed, and then — then you're required to file a notice with the Court, and we'll bring him back in and have a discussion as to what is the best position for him to be in at that time."

R. Roque did not register objections, although differences remained between his written judgment of conviction and Judge Kendall's oral pronouncement. For drug treatment, the written judgment banned alcohol during the entire term of supervised release, not just until completion of a program. The written judgment does not state that probation visits occur "at any reasonable time" and does not mention community service.

### 5. Ramirez

Ramirez, another lower-level worker, received a total sentence of 188 months' imprisonment after his guilty plea to the drug trafficking conspiracy in Count One. During sentencing, Judge Kendall found him responsible for at least 299 kilograms of cocaine and 20 kilograms of heroin, as well as possession of a firearm. Ramirez's 188-month sentence fell at the bottom of his guidelines range of 188 to 235 months.

In their sentencing memoranda, Ramirez and the government addressed the issue of unwarranted sentencing disparities. Ramirez referenced the sentences of E. Roque, R. Roque, and S. Ochoa while the government listed the sentences given to each member of the Roque organization and contrasted its recommendation for Ramirez to Sanchez's 210-month sentence: "The controlling differences between Ramirez and Gerardo Sanchez—the differences that necessitate a longer sentence for Ramirez [—] are the defendant's possession of the firearms and the reckless conduct during his flight from law enforcement endangering the public and the officers." At sentencing, Judge Kendall asked the parties to consider the larger roles of each codefendant: "So what I need you to do for me in this case, which I've asked [Ramirez's counsel] to do each time as well, is we need to always look at the co-defendants and the relationship between them so that I'm accurately sentencing him for his role in the offense as well." Both sides did so. In particular, the sentences and conduct of Roque defendants Koon, Sanchez, and Mendoza each came up, but the sentences and conduct of the Ochoa/Contreras defendants did not.

In pronouncing Ramirez's sentence, Judge Kendall addressed unwarranted disparities under 18 U.S.C. § 3553(a)(6). She identified Sanchez as being "closest" to Ramirez and told Ramirez that she had "to look at the other individuals that [he was] sentenced with, and they each have different roles, and [she had] to make sure that [he was] not given a greater or lesser sentence."

6. Mendoza

Mendoza, yet another lower-level worker, received a total sentence of 150 months' imprisonment after his guilty plea to

the drug trafficking conspiracy in Count One. During sentencing, Judge Kendall found him responsible for at least 72 kilograms of cocaine and possessing a firearm in connection his narcotics offense. Mendoza's 150-month sentence fell within his guidelines range of 135 to 168 months.

Judge Kendall applied a two-point enhancement under U.S.S.G. § 2D1.1(b)(1) for Mendoza possessing a firearm. In doing so, Judge Kendall relied upon Mendoza's Instagram message depicting an assault rifle and warning of a "rain of bullet[s] for the snitches." Mendoza's counsel argued that this was merely "a comment that's made amongst friends." But to Judge Kendall, Mendoza deserved the two-point enhancement because that message concerned the conspiracy and served as "a warning to anyone that if they reveal the conspiracy that they will suffer the consequences. So it is a — it is a way to continue concealing the conspiracy."

As for unwarranted sentencing disparities, Mendoza compared his sentence with those given to the Roque defendants— Sanchez, Koon, and I. Diaz—and the Ochoa/Contreras defendants—S. Ochoa, Contreras, Cesar Carrilo, Rafael Collazo, and Edgar Valdelamar—to argue "he is less culpable than most, if not all, of the defendants identified." For its part, the government addressed unwarranted disparities by stressing Mendoza's role as an "integral, trusted part" of the Roque organization. At sentencing, when the government mentioned the need to avoid unwarranted disparities, Judge Kendall cut in to say: "Right. We start first with mine." Later, Mendoza's counsel also reiterated that "I do think the unwarranted sentencing disparities is something we need to focus on," while listing the sentences received by S. Ochoa, Contreras, and Ramirez.

When sentencing Mendoza, Judge Kendall mentioned the diligence needed to track each sentence across multiple hearings. One way she did that was to keep a chart: "I do my own chart … on these, and I try to keep track of all of it. This is my chart, not the one from the government. And I try to keep track of all of the differences. It just expands and expands with each sentencing." Judge Kendall later referenced the issue of "disparity in sentences" and that she looks for "respect for the law" in considering that issue.

### 7. J. Cervantes

J. Cervantes, a courier, received a total sentence of 168 months' imprisonment, based on his plea to the drug trafficking conspiracy in Count One. During sentencing, Judge Kendall found him responsible for 170 kilograms of cocaine and 10 kilograms of heroin. J. Cervantes's 168-month sentence fell at the bottom of his guidelines range of 168 to 210 months.

In his sentencing memorandum, J. Cervantes asserted "[d]isparity is a major issue in this case." Specifically, he made a detailed comparison to his sister, A. Cervantes, (24 months by Judge Kendall), and argued for a sentence closer to what she received. The government disagreed and contended a 168-month sentence for J. Cervantes would "place him appropriately among his co-defendants," and would "fit[] in with his co-defendants." At sentencing, J. Cervantes's counsel also made a detailed and lengthy comparative argument to A. Cervantes's sentence. But the government contrasted J. Cervantes's circumstances with those of the other Roque defendants, and distinguished J. Cervantes from A. Cervantes by noting "how unique her circumstances were, just how many mitigating factors that nobody else in this case had that led to a 24-month sentence." Moreover, when comparing J. Cervantes

and "some of his other co-defendants," the Government noted that "[J. Cervantes] didn't provide any cooperation."

When sentencing J. Cervantes, Judge Kendall identified the need to avoid unwarranted disparities under § 3553(a): "So let me talk about the other defendants, because I've been living this case for some time now." Acknowledging she was "going to focus on Angelica because that's what [J. Cervantes's counsel] did[,]" Judge Kendall noted the difference in criminal history and that A. Cervantes received the Sentencing Guidelines safety valve, among other differences.

Two issues also arose concerning J. Cervantes's guilty plea. First, in his plea agreement, J. Cervantes admitted to traveling to Union Station on "at least seven separate occasions" to pick up drug packages, and also to traveling to Union Station "with Angelica [Cervantes] on multiple other occasions" to do the same. His plea agreement originally stated, however, that J. Cervantes traveled to Union Station with A. Cervantes on "at least eight other occasions." The phrasing changed to "multiple other occasions" only when J. Cervantes corrected it at his change of plea hearing. Second, despite that change, J. Cervantes's plea agreement still stated that J. Cervantes, "either alone or in the company of Angelica [Cervantes], collected and transported at 15 packages [sic] that he knew contained narcotics." Ultimately, Judge Kendall neither mentioned the 15-package number nor engaged with the specifics of the trips to Union Station when imposing J. Cervantes's sentence.

**B**

For comparison, we list the sentences that Judge Kendall imposed on those Roque defendants who did not appeal—Koon, A. Cervantes, and I. Diaz. Largely because they acted

as couriers, these defendants each received shorter sentences than the seven primary Roque defendants.

| Roque DTO | Guidelines Range | Sentence |
|---|---|---|
| Koon | 108 to 135 months | 108 months |
| A. Cervantes | 51 to 63 months | 24 months |
| I. Diaz | 135 to 168 months | 108 months |

We also list the sentences of the Ochoa/Contreras defendants—Valdelamar, Collazo, S. Ochoa, Carrilo, and Contreras—imposed by Judge Gettleman, because they are relevant to the Roque defendants' sentencing disparity arguments. As with Koon, A. Cervantes, and I. Diaz, these Ochoa/Contreras defendants received significantly lower sentences than the seven primary Roque defendants.

| Ochoa/Contreras DTO | Guidelines Range | Sentence |
|---|---|---|
| Valdelamar | 87 to 108 months | 60 months |
| Collazo | 235 to 293 months | 90 months |
| S. Ochoa | 262 to 327 months | 180 months |
| Carrilo | 108 to 135 months | 65 months |
| Contreras | 325 to 405 months | 140 months |

## III

With this background, the seven Roque defendants raise many of the same arguments: (A) five contend Judge Kendall failed to correctly interpret the need to avoid unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6), and six (the same five, plus another) assert a failure to consider this principal argument in mitigation; (B) two of those seven defendants question the application of the Sentencing Guidelines; and (C) two different defendants contest their supervised release conditions.

## A

Several of the Roque defendants contest Judge Kendall's legal interpretation of § 3553(a)(6) and question whether she adequately addressed this principal mitigation argument, both allegedly procedural errors. We review these claims de novo. *United States v. Durham*, 766 F.3d 672, 685 (7th Cir. 2014); *United States v. Davis*, 764 F.3d 690, 694 (7th Cir. 2014).

Section 3553(a)(6) mandates that, when imposing a sentence, the district court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Of course, this "does not require that defendants in a single case be sentenced to identical prison terms." *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009). Rather, § 3553(a)(6) provides for discretionary comparison and "applies to defendants 'with *similar records* who have been found guilty of *similar conduct.*'" *United States v. Durham*, 645 F.3d 883, 897 (7th Cir. 2011) (quoting 18 U.S.C. § 3553(a)(6)). But "[a] district court is entitled, if it wishes, to apply the rule against unwarranted disparities to co-defendants sentences." *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018). Further, our case

law neither precludes nor requires comparison to a parallel conspiracy—whether before the same or different judges—when considering unwarranted disparities under § 3553(a)(6). *See Durham*, 645 F.3d at 897.

*Misinterpreting § 3553(a)(6)*. Five defendants—E. Roque, P. Diaz, R. Roque, Mendoza, and J. Cervantes—argue Judge Kendall erroneously thought she could not consider the parallel Ochoa/Contreras sentences under § 3553(a)(6). They each adopt the brief of E. Roque, who cites *United States v. Reyes-Medina* to assert that § 3553(a)(6) commands this consideration. 683 F.3d 837, 841 (7th Cir. 2012) According to these five defendants, Judge Kendall's sentencing comments reveal that she believed herself legally barred from considering sentences such as those by Judge Gettleman of the Ochoa/Contreras defendants. These defendants contend this was error. The government responds that Judge Kendall did not expressly misinterpret § 3553(a)(6), so she could not have procedurally erred.

To ascertain whether a district court misapprehended its discretion under § 3553(a)(6), we must consider the context of its statements. *Reyes-Medina*, 683 F.3d at 841 ("[I]t is clear from the context of his statement that the judge was simply giving an example of an instance when the factor would be especially relevant."). So viewed, such interpretive error presents itself plainly from the record; it must leap off the page. *Compare United States v. Prado*, 743 F.3d 248, 252 (7th Cir. 2014) ("The district court's statements at the sentencing hearing indicate that the court thought it lacked the discretion to consider disparities among defendants as a matter of law."), *with Durham*, 766 F.3d at 686 ("Considered in context, the judge's remarks do not suggest that she thought she was *legally barred* from

considering the other sentences but, rather, that she was exercising her *discretion* not to consider them in light of the particularly severe consequences of the fraud in this case."). Our case law provides that only a "clear statement" of misinterpretation will suffice to show that a district court misapprehended its discretionary authority under § 3553(a)(6).

So Judge Kendall committed interpretive error here only if she explicitly stated that § 3553(a) barred her consideration of the sentences given to the Ochoa/Contreras defendants by Judge Gettleman.[4]

*Cunningham Error*. Six defendants—E. Roque, P. Diaz, R. Roque, Mendoza, J. Cervantes, and Ramirez—also contend the district court failed to adequately address the merits of their unwarranted sentencing disparities argument. They argue Judge Kendall did not address this principal mitigation argument in enough detail at each sentencing and therefore contravened *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005) (holding that a district court must address a criminal defendant's "principal" arguments in mitigation unless such arguments are "so weak as not to merit discussion"). This requirement flows from *Rita v. United States*, which held that "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." 551 U.S. 338, 356 (2005). The government disagrees and maintains that, in any event, the

---

[4] The government contends each defendant has forfeited this argument to varying degrees. We need not resolve the question of forfeiture because Judge Kendall did not misinterpret § 3553(a)(6).

below-or-within guidelines range sentences that these six defendants received foreclose any *Cunningham* challenges.

*Cunningham* does not require artificial thoroughness. A district court "need not discuss each section 3553(a) factor at sentencing and need not respond to every pithy argument that a defendant raises, just the 'principal' ones." *United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009). Although "[a] rote statement that the judge considered all relevant factors will not always suffice[,]" *Cunningham*, 429 F.3d at 679, "[s]o long as the record gives us confidence that the court meaningfully considered the defendant's mitigation arguments, 'even if implicitly and imprecisely,' that is enough." *United States v. Jones*, 798 F.3d 613, 618 (7th Cir. 2015) (quoting *United States v. Diekemper*, 604 F.3d 345, 355 (7th Cir. 2010)).

Evaluating a *Cunningham* challenge requires a close look at context. "[W]e try to take careful note of context and the practical realities of a sentencing hearing." *United States v. Gary*, 613 F.3d 706, 709 (7th Cir. 2010). That means "we regularly affirm sentences where the district judge does not explicitly mention each mitigation argument raised by the defendant." *United States v. Paige*, 611 F.3d 397, 398 (7th Cir. 2010). All in all, district courts "need not belabor the obvious." *Gary*, 613 F.3d at 709.

*Cunningham and § 3553(a)(6)*. The Sentencing Guidelines play a pivotal role when *Cunningham* error intertwines with consideration of unwarranted sentencing disparities. This is because "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Generally, when a district court "correctly calculated and carefully reviewed the Guidelines range, [the district court] necessarily gave significant weight and

consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007); *cf. Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (noting that a district court judge is "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case") (quoting *Gall*, 552 U.S. at 51)). And our case law makes clear that "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (decided pre-*Gall*). We have even stated that "[c]hallenging a within-range sentence as disparate is a 'pointless' exercise." *United States v. Chapman*, 694 F.3d 908, 916 (7th Cir. 2012) (per curiam).

Put another way, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). We nevertheless remain "open in all cases to an argument that a defendant's sentence is unreasonable because of a disparity with the sentence of a co-defendant, but such an argument will have more force when a judge departs from a correctly calculated Guidelines range to impose the sentence." *Statham*, 581 F.3d at 556.[5]

This is all to say that "[a] sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)." *Bartlett*, 567

---

[5] Our recent decision in *United States v. Jones* does not alter this doctrinal framework. 962 F.3d 956 (7th Cir. 2020). *Jones* concerned a district court's failure to adequately explain its deviation from the Sentencing Guidelines. *Id.* at 960. ("A significant deviation, like this one, requires an especially compelling justification."). In these consolidated cases, no such deviations occurred; in fact, Judge Kendall gave sentences to each defendant within or below the guidelines.

F.3d at 908 (quoting *Gall*, 552 U.S. at 54). In *Bartlett*, we recognized this principle in the wake of *Rita, Gall*, and *Kimbrough*, and we have reaffirmed it since. *Blagojevich*, 854 F.3d at 921 ("[T]o base a sentence on a properly determined Guidelines range is to give adequate consideration to the relation between the defendant's sentence and those of other person … ."); *United States v. Thompson*, 864 F.3d 837, 841 (7th Cir. 2017) ("In any event, the court imposed a within-guidelines sentence, thereby neutralizing the risk of unwarranted sentencing disparities."); *United States v. Nania*, 724 F.3d 824, 840 (7th Cir. 2013) ("In fact, we give the Sentencing Commission's views on these issues such credit that we have stated a within-Guidelines sentence *necessarily* takes into account unwarranted disparities."); *United States v. Annoreno*, 713 F.3d 352, 359 (7th Cir. 2013) ("Sentencing within the range advised by the sentencing guidelines accounts for concerns of unwarranted sentencing disparities … ."). As a result, an argument that a district court did not adequately consider unwarranted sentencing disparities when giving a within-guidelines sentence may "therefore be passed over in silence." *United States v. Martin*, 718 F.3d 684, 688 (7th Cir. 2013) (citing *Cunningham*, 429 F.3d at 678). In those cases, a district court need not "say a word about § 3553(a)(6)'s application … to satisfy the procedural requirement that he give that factor 'meaningful consideration.'" *Reyes-Medina*, 683 F.3d at 841.

So Judge Kendall contravened *Cunningham* only if, when viewing her sentencing remarks in context, she improperly calculated the Sentencing Guidelines and therefore failed to adequately address each defendant's unwarranted sentencing disparity argument.

1.  E. Roque

In E. Roque's sentencing, there was no interpretive error under § 3553(a)(6) or *Cunningham* error. Judge Kendall did not clearly state she believed herself barred from considering the sentences Judge Gettleman gave to the Ochoa/Contreras defendants. Given this series of complex cases, when Judge Kendall asked whether she sentenced S. Ochoa and Navarro-Galvan, that showed factual clarification, not legal misapprehension. Although Judge Kendall did not address S. Ochoa's and Navarro-Galvan's sentences, E. Roque received a below-guidelines sentence of 420 months' imprisonment. This sentence necessarily complies with the need to avoid unwarranted sentencing disparities under § 3553(a)(6), *Bartlett*, 567 F.3d at 908, and necessarily considers that argument under *Cunningham*. *Martin*, 718 F.3d at 688; *Reyes-Medina*, 683 F.3d at 841.

2.  P. Diaz

P. Diaz's sentencing record shows much the same: no § 3553(a)(6) misinterpretation and no *Cunningham* error. Judge Kendall did not clearly state that she misapprehended her comparative authority under § 3553(a)(6). At most, her question to the Government concerning the sentence she gave E. Roque—"And I just gave Mr. Roque 300 and 120; is that correct? 420 all together?"—is another wise clarification, not a definitive interpretation, let alone an erroneous one. That exchange came in the context of the government's rejection of any comparison to S. Ochoa's sentence by Judge Gettleman, so Judge Kendall implicitly considered that as well. In arriving at P. Diaz's sentence under § 3553(a), Judge Kendall specifically referenced the need to look at the "roles of the different conspirators here" to make "enough divergence" with the

lengthier sentence imposed upon E. Roque. Such a statement wipes away any *Cunningham* argument, especially when P. Diaz received a below-guidelines sentence of 250 months' imprisonment. *Martin*, 718 F.3d at 688; *Reyes-Medina*, 683 F.3d at 841; *Bartlett*, 567 F.3d at 908.

### 3.  R. Roque

R. Roque cannot claim misinterpretation of § 3553(a)(6) or *Cunningham* error, either. It is true that R. Roque's counsel compared his sentencing situation to that of both other Roque defendants (such as Sanchez) and Ochoa/Contreras defendants (such as Contreras). But again, we see no misapprehension of § 3553(a)(6) by Judge Kendall. Judge Gettleman's sentences were mentioned at R. Roque's sentencing, particularly in the context of R. Roque's possible minor role reduction. In rejecting that reduction, Judge Kendall necessarily considered those sentences and did not say she could not consider them. As for *Cunningham* error, Judge Kendall may not have specifically connected R. Roque's sentence to those of the Ochoa/Contreras defendants, although she did note R. Roque's "integral role" within the Roque organization. Even still, R. Roque's within-guidelines sentence of 210 months' imprisonment insulates his sentence from a *Cunningham* challenge. *Martin*, 718 F.3d at 688; *Reyes-Medina*, 683 F.3d at 841; *Bartlett*, 567 F.3d at 908.

### 4.  Mendoza

Mendoza's § 3553(a)(6) misinterpretation and *Cunningham* arguments also fail. Prompted by the government's reference to avoiding unwarranted sentencing disparities, Judge Kendall remarked: "We start first with mine." That statement does not show misinterpretation but means that Judge Kendall began by considering the Roque sentences, and then

she could, if she desired, consider the Ochoa/Contreras sentences. Before this "first" exchange, the government referred to Mendoza's sentencing memorandum addressing the Ochoa/Contreras sentences. And immediately after that "first" exchange, the district court heard Mendoza's arguments considering the Ochoa/Contreras sentences. This sequence does not evidence a § 3553(a)(6) misinterpretation. Judge Kendall's diligence in keeping a chart of the sentences of the various defendants forecloses a *Cunningham* claim as well. She stated that "to keep track of all the differences" between sentences, she kept her own chart and "not the one from the government." Even if Judge Kendall's chart did not include the Ochoa/Contreras defendants, Mendoza received a within-guidelines sentence of 150 months' imprisonment that survives any *Cunningham* claim. *Martin*, 718 F.3d at 688; *Reyes-Medina*, 683 F.3d at 841; *Bartlett*, 567 F.3d at 908.

### 5. J. Cervantes

J. Cervantes cannot claim that Judge Kendall misinterpreted § 3553(a)(6) or committed *Cunningham* error. At sentencing, J. Cervantes's counsel mentioned only the sentence given to A. Cervantes by Judge Kendall, and not the sentences given to Ochoa/Contreras defendants by Judge Gettleman. Again, there is no interpretive error here because Judge Kendall could not have thought herself barred from considering Judge Gettleman's sentences that went unmentioned. Nor is there *Cunningham* error. Judge Kendall expressly stated she wanted to talk about the other Roque defendants "because [she had] been living in this case for some time now." Then, Judge Kendall acknowledged she was "going to focus on Angelica because that's what [J. Cervantes's counsel] did" and then she distinguished the cases of the two siblings. J.

Cervantes's within-guidelines sentence of 168-months' imprisonment further bars any *Cunningham* challenge. *Martin*, 718 F.3d at 688; *Reyes-Medina*, 683 F.3d at 841; *Bartlett*, 567 F.3d at 908.

### 6. Ramirez

Ramirez asserts only a *Cunningham* error, but that fails too. During sentencing, Judge Kendall stated "we need to always look at the co-defendants and the relationship between them so that I'm accurately sentencing him for his role in the offense as well." And when crafting Ramirez's sentence under § 3553(a), Judge Kendall noted she had "to look at the other individuals that [Ramirez was] sentenced with, and they each have greater or a lesser sentence." Sanchez was the defendant "closest" to Ramirez, according to Judge Kendall. Finally, although Judge Kendall may not have mentioned the sentences of the Ochoa/Contreras defendants by name, this makes no difference because Ramirez received a within-guidelines sentence of 188 months' imprisonment. *Martin*, 718 F.3d at 688; *Reyes-Medina*, 683 F.3d at 841; *Bartlett*, 567 F.3d at 908.

In sum, no Roque organization defendant has demonstrated that Judge Kendall committed either interpretive error under § 3553(a)(6) or *Cunningham* error.

### B

Two defendants—Mendoza and J. Cervantes—challenge their guidelines calculations. Mendoza received a two-level enhancement for possession of a firearm in connection with a drug trafficking offense under U.S.S.G. § 2D1.1(b)(1), a finding he contends the evidence does not support. Likewise, J. Cervantes asserts he should have received a two-level minor role reduction under U.S.S.G. § 3B1.2(b), and that Judge

Kendall relied upon inaccurate information in sentencing. Both guidelines claims concern factual assessments so we review those for clear error, *United States v. Thurman*, 889 F.3d 356, 371 (7th Cir. 2018); *United States v. Tartareanu*, 884 F.3d 741, 745 (7th Cir. 2018), and an inaccurate information claim constitutes procedural error so we review that claim de novo. *Jones*, 962 F.3d at 960.

### 1. Mendoza

Mendoza's § 2D1.1(b)(1) challenge easily fails. Under § 2D1.1(b)(1), a two-level enhancement applies "[i]f a dangerous weapon (including a firearm) was possessed." Application Note 11 of § 2D1.1(b)(1) states "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." This imposes a "twofold burden." *Thurman*, 889 F.3d at 372. "First, the Government must prove by a preponderance of the evidence that the defendant possessed a weapon either actually or constructively, meaning he 'had the power and the intention to exercise dominion or control of the firearm." *Id.* (internal quotation marks omitted). Second, "[i]f the Government satisfies this burden, then the defendant must show that it is 'clearly improbable [that] he possessed the weapon in connection with the drug offense.'" *Id.* (quoting *United States v. Morris*, 836 F.3d 868, 872 (7th Cir. 2016)). Here, the government proved possession of a firearm without difficulty. Mendoza sent the Instagram messages during the conspiracy and they not only depicted an automatic rifle, but also warned of a "rain of bullet[s] for the snitches." Mendoza's assertion that this possession was not connected to the offense—because warning of retribution against informants is "a comment that's made amongst friends"—is baseless. As Judge Kendall

noted, Mendoza's message served as a "warning to anyone that if they reveal the conspiracy that they will suffer the consequences." Mendoza has not shown clear error on this point.

### 2. J. Cervantes

J. Cervantes's role as a courier does not automatically entitle him to a minor role reduction under U.S.S.G. § 3B1.2(b). Rather, that provision provides for a two-level decrease "[i]f the defendant was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). Not every courier is a minor participant, and not every minor participant is a courier. *United States v. Rodriguez-Cardenas*, 362 F.3d 958, 960 (7th Cir. 2004); *see* U.S.S.G. § 3B1.2(b)(1), cmt. n.3(A) ("[A] defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under § 1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under this guideline.").

Section 3B1.2(b)'s application instead turns on culpability. Under Application Note 3, § 3B1.2(b) applies to defendants "who play[] a part in committing the offense that makes [them] substantially less culpable than the average participant in the criminal activity." This means the relevant comparison is "the defendant's role to that of an average member of the conspiracy, not to that of the leaders." *United States v. Guzman-Ramirez*, 949 F.3d 1034, 1037 (7th Cir. 2020). A "non-exhaustive list of factors" plays a role in this determination. U.S.S.G. § 3B1.2, cmt. n.3(C).[6] At bottom, the defendant bears

---

[6] Those factors include:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

the burden to prove that the enhancement should apply by a preponderance of the evidence. *United States v. Sandoval-Velazco*, 736 F.3d 1104, 1107 (7th Cir. 2013).

J. Cervantes has forfeited any claim to a minor role reduction, even if he was substantially less culpable than the average Roque defendant. Only obliquely (if at all) did J. Cervantes reference the reduction during his § 3553(a) colloquy, and he failed to raise the topic when, at the beginning of the sentencing hearing, the district court calculated his guidelines range. The closest J. Cervantes's counsel came to advocating for the reduction at sentencing is when he acknowledged that J. Cervantes did not receive it: "[A. Cervantes] had a minor role, which we were not able to acquire for Juan Cervantes, even though they had essentially the same role." Nothing in J. Cervantes's objections to the presentence investigation report or in the sentencing transcript reveals this request for a minor role reduction. As we have stated, "defense counsel should have articulated this objection as a challenge to the

---

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, cmt. n.3(C).

Guidelines calculation, rather than advancing it to support a downward variance under § 3553(a)." *United States v. Butler*, 777 F.3d 382, 387 (7th Cir. 2015). This forfeiture therefore triggers plain error review. *United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019).

Under any standard, Judge Kendall did not err in handling J. Cervantes's minor role reduction. Under § 3B1.2(b). "[T]he sentencing court is in the best position to determine the role that a defendant had in the criminal activity." *Sandoval-Velazco*, 736 F.3d at 1107. This makes things difficult for J. Cervantes, especially when § 3B1.2(b)'s "application is fact specific, based on the district court's evaluation of '[defendant's] role in context of the other participants in the scheme.'" *Guzman-Ramirez*, 949 F.3d at 1037 (quoting *United States v. Leiskunas*, 656 F.3d 732, 739 (7th Cir. 2011)). Further foreclosing J. Cervantes's claim is the amount of the drugs attributed to him: 170 kilograms of cocaine and 10 kilograms of heroin. *See Sandoval-Velazco*, 736 F.3d at 1109 ("While the court cannot base its denial of a reduction solely on the quantity of drugs involved in a case, it can give effect to a defendant's role in connection with those drugs."). Besides couriering drugs, J. Cervantes recruited members into the conspiracy, unloaded narcotics at stash houses, and even blocked law enforcement from apprehending A. Cervantes. These facts confirm Judge Kendall's finding that J. Cervantes was not "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2(b)); *see Sandoval-Velazco*, 736 F.3d at 1109 (rejecting minor role adjustment for courier with greater-than-average involvement).

J. Cervantes also asserts he received his sentence based on two erroneous pieces of information. The first is that when his

plea agreement changed the frequency of his trips to Union Station from "at least eight other occasions" to "multiple occasions[,]" it rendered the following sentence—"[J.] Cervantes, either alone or in the company of Angelica [Cervantes], collected and transported at 15 packages [sic] that he knew contained narcotics"—erroneous. The second is that in imposing J. Cervantes's sentence, Judge Kendall considered that A. Cervantes cooperated, when she had not. Both assertions fail for similar reasons.

By stipulating to those plea agreement facts, J. Cervantes waived review of any inaccuracy as to the frequency of trips to Union Station: "A defendant who stipulates to facts as part of a written plea agreement also waives challenges to the district court's reliance on those facts." *United States v. Scott*, 657 F.3d 639, 640 (7th Cir. 2011) (per curiam); *see United States v. Walsh*, 723 F.3d 802, 807 (7th Cir. 2013). Even assuming J. Cervantes preserved this alleged error, the sentencing record does not show that Judge Kendall relied on the contested information at sentencing. Although "[a] convicted defendant has a due process right to be sentenced based on accurate information," *United States v. Propst*, 959 F.3d 298, 304 (7th Cir. 2020), to succeed on attacking a sentence that defendant "must show that inaccurate information was before the court and that the court relied upon it." *United States v. Pennington*, 908 F.3d 234, 239 (7th Cir. 2018). Judge Kendall's comments concerning the J. Cervantes's drug weight do not demonstrate specific engagement with, much less actual reliance upon, the frequency of J. Cervantes's trips to Union Station. *United States v. Chatman*, 805 F.3d 840, 844 (7th Cir. 2015) ("A court demonstrates 'actual reliance on misinformation' when sentencing if 'the court gives explicit attention to it, founds its sentence at least in part on it, or gives specific consideration

to the misinformation before imposing sentence.'" (quoting *Promotor v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010))). This claim fails as waived or on the merits.

J. Cervantes also does not succeed on the claim that Judge Kendall relied upon A. Cervantes's cooperation. Because he did not object to the government's supposedly incorrect characterization of A. Cervantes's safety valve proffer as cooperation, J. Cervantes has forfeited this argument. *Propst*, 959 F.3d at 302–04. But whether under plain error or de novo review, J. Cervantes still fails to show that the government presented inaccurate information for Judge Kendall to rely upon. Unsurprisingly, "[c]ontext plays a crucial role in evaluating the degree of influence that an unsupported fact has had on a district court's sentencing decision." *United States v. Corona-Gonzalez*, 628 F.3d 336, 342 (7th Cir. 2010). The government did not expressly claim that A. Cervantes cooperated and did not characterize A. Cervantes's safety valve proffer as cooperation. The government did note that "[b]ut on the other hand, [J. Cervantes] didn't provide any cooperation[,]" in the context of offering a comparison between J. Cervantes and "some of his other co-defendants." J. Cervantes cannot juxtapose these remarks against Judge Kendall's statements concerning A. Cervantes's behavior to secure relief. This is especially so when Judge Kendall accurately noted that A. Cervantes "came in on a safety valve." Regardless, referring to a safety valve proffer as cooperation may have indeed been accurate. *E.g.*, *United States v. Draheim*, 958 F.3d 651, 656 (7th Cir. 2020).

To sum up, Mendoza and J. Cervantes received properly calculated guidelines ranges from Judge Kendall, who did not rely on inaccurate information in sentencing J. Cervantes.

## C

Two defendants—Sanchez and R. Roque—challenge their supervised release conditions. Both claim Judge Kendall's oral pronouncements of their sentences contradict their written judgments of conviction. We review de novo these discrepancy claims. *United States v. Fisher*, 943 F.3d 809, 816 (7th Cir. 2019).

As a rule, "where the oral pronouncement of the court conflicts with the court's later written order, the oral pronouncement controls." *United States v. Orozco-Sanchez*, 814 F.3d 844, 847 (7th Cir. 2016). That means "[i]f an inconsistency exists between an unambiguous oral sentence and the written judgment, the oral sentence controls and the written judgment should be amended to reflect the oral sentence." *Fisher*, 943 F.3d at 816. "But not all differences between the written and oral sentences amount to inconsistencies." *Id.* Rather, "[i]f the oral sentence is ambiguous or broad, we may use the written judgment as clarification, and the written judgment need not be amended." *Id.; see United States v. Bonanno*, 146 F.3d 502, 511 (7th Cir. 1998). We typically remand if any irreconcilable discrepancies exist, but if "we are confident that we can tell what the district court intended," then we may "simply correct the judgment ourselves." *United States v. Smith*, 906 F.3d 645, 651 (7th Cir. 2018).

### 1. Sanchez

Sanchez's two alleged inconsistencies concern the no-contact condition and the drug treatment condition. The no-contact condition orally imposed by Judge Kendall referred to a ban on communicating with Sanchez's "co-defendants in this activity." Sanchez's written judgment of conviction, however, bars him from contacting two Roque defendants—Koon

and Ochoa-Canela—who pleaded guilty before the government charged Sanchez in the fourth superseding indictment. Yet the government charged Koon and Ochoa-Canela in its three previous indictments and previously referred to Koon as Sanchez's codefendant. So at most, Judge Kendall's oral pronouncement is ambiguous. Given this procedural history, Sanchez's written judgment merely clarifies that Judge Kendall meant to include all codefendants, past and present. *See Fisher*, 943 F.3d at 816; *Bonanno*, 146 F.3d at 512.

Concerning Sanchez's drug treatment condition, no conflict exists between Judge Kendall's oral pronouncement and the written judgment of conviction. During sentencing, Judge Kendall recommended a drug treatment program after "evaluation by the probation officer" and Sanchez's written judgment states that he "shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year." Taken together, the treatment recommendation and testing regimen conditions fit rather than conflict. If Sanchez's drug treatment program requires testing, the 104-test figure in Sanchez's written judgment is just a cap on the number of urine tests that Sanchez must complete as part of that treatment program. *United States v. Downey*, 908 F.3d 205, 207 (7th Cir. 2018). We see no conflict here.

### 2. R. Roque

For his part R. Roque cites three alleged inconsistencies between Judge Kendall's oral pronouncement and his written judgment of conviction. First, the oral pronouncement prohibited R. Roque from using alcohol only until he graduated from the drug treatment program, although the written judgment's alcohol prohibition lasts for the entire supervised

release period. Because the government concedes error on this condition and Judge Kendall's oral pronouncement indicates her intent, we order that the written judgment be amended to prohibit R. Roque from consuming alcohol until he completes the drug treatment program. *See Smith*, 906 F.3d at 651. Second, Judge Kendall orally required R. Roque to permit probation visits "at any reasonable time[,]" but the written judgment contains no such language. The government again concedes error, and Judge Kendall's oral pronouncement reveals her intent, so we order that the written judgment be amended to permit probation visits "at any reasonable time." *See id.* And third, Judge Kendall orally recommended an alternative to the community service condition, but the terms of that recommendation do not appear in R. Roque's written judgment. No conflict exists between the two. Judge Kendall directed her comments not at R. Roque, but at the probation officer, when she stated: "[I]f, after 60 days of supervision, he is unemployed, and then — then you're required to file a notice with the Court, and we'll bring him back in and have a discussion as to what is the best position for him to be in at that time." If anything, this statement makes a request of the probation officer, and therefore it cannot constitute a discrepancy for a condition imposed on R. Roque.

## IV

The seven Roque defendants fail to demonstrate any errors in their sentences. Judge Kendall properly interpreted and considered unwarranted sentencing disparities under § 3553(a)(6), correctly calculated the Sentencing Guidelines, and, with one exception, appropriately imposed supervised release conditions. We thus ORDER that R. Roque's alcohol consumption condition, as stated in discretionary condition 7

of his written judgment, be amended to prohibit consumption of alcohol until completion of his drug treatment program. We also ORDER that R. Roque's probation visit condition, as stated in discretionary condition 16 of his written judgment, be amended to permit probation officer visits "at any reasonable time." We AFFIRM the defendants' sentences in every other aspect.